HERBERT L. STAHNKE and LYDIA L. STAHNKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stahnke v. Commissioner
Docket No. 7821-78.
United States Tax Court
T.C. Memo 1980-369; 1980 Tax Ct. Memo LEXIS 216; 40 T.C.M. (CCH) 1177; T.C.M. (RIA) 80369; September 10, 1980, Filed Robert F. Bentley and J. Michael Goulding, for the petitioners. Brad S. Ostroff, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' *218 Federal income taxes for the calendar year 1975 in the amount of $747. The only issue for decision is whether petitioners are entitled to deduct the expenses incurred in 1975 by Herbert L. Stahnke in connection with his activities in writing, consulting, lecturing, and research under the provisions of sections 162 and 183, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Herbert L. and Lydia L. Stahnke, husband and wife, resided in Tempe, Arizona, at the time of the filing of their petition in this case. They filed a joint Federal income tax return for the calendar year 1975 with the Office of the Internal Revenue Service at Ogden, Utah. Herbert L. Stahnke (petitioner) was born on June 10, 1902. He received a bachelor of science degree from the University of Chicago in 1928, a masters degree from the University of Arizona in 1935, and a Ph.D. from Iowa State University in 1939. From 1928 to 1940 he was employed as the head of the science department of Mesa Union *219 High School in Mesa, Arizona. In 1941 he began his career as a professor of zoology at Arizona State University (university) where he remained until retiring from teaching on June 30, 1972, because he had reached the mandatory retirement age of 70 set by the school. Petitioner's lifelong interest in venomous animals began when he was searching for a topic for his doctoral thesis. He read a newspaper article which reported that a five-year-old boy had died from a scorpion sting. That story prompted him to study scorpions because he had a two-year-old daughter of his own and he knew that there was nothing which could be done for a young child who had been stung by a scorpion. Since that time he has published over 100 articles on venomous animals in such periodicals as Popular Science, Arizona Medicine, and the Entomological News. His expertise and contributions to science have been recognized through numerous awards and honors. He was chosen as one of Arizona's Men of Achievement in 1964. He was listed in Personalities of the West and Midwest, Who's Who in America, Who's Who in Education, and the British Blue Book. He was a member of the American Association for the *220 Advancement of Science, Herpetological League, Arizona Academy of Science, and the Phi Delta Kappa and Sigma Psi science honor societies. Petitioner also served as a national consultant in comparative venomology to the Surgeon General of the U.S. Air Force in 1959 and 1961. He was named as an Arizona Honorary Scientist by the Arizona Association of Young Scientists of America in 1964 and received the Boy Scouts of America Certificate of Appreciation in 1972. Upon his retirement from the university, he was selected as a Professor Emeritus of Zoology and received the Annual Citation for Distinguished Service to Science Education from the National Science Teachers Association in 1979. While he was a professor of zoology at Arizona State University, although not required to do so, he actively pursued his interests in venomous animals outside the classroom. In 1944 he founded the Poisonous Animals Research Laboratory in order to facilitate his research. He was the director of the laboratory from 1944 until his retirement in 1972. During these years, his research produced two very significant discoveries. One concerned the use of morphine by the medical profession to relieve the *221 pain of children stung by scorpions. He discovered that depending on the morphine derivative, the morphine itself increased the toxicity of the scorpion's venom from three to seven times. As a result, the treatment for pain was actually producing death. Petitioner's second contribution was the development of a scorpion anti-venom which was then manufactured by the laboratory and distributed to the medical profession in Arizona through 95 depots established throughout the State. In fact, a few weeks before his retirement in 1972, a young student told him that she had been the first child to receive his anti-venom. Petitioner recalled that he received a late night call from a physician who told him that if he wanted to test his anti-venom, a two-year-old girl was dying from a scorpion sting. He went to the laboratory and picked up the antivenom. The anti-venom was injected into the child at the hospital. Within 20 minutes the little girl calmed down and fell asleep and was released from the hospital the following morning. Petitioner's efforts were not solely focused on his research however. He had a relatively full teaching load and from 1950 to 1962 was busy with his administrative *222 duties as the head of the Division of Life Sciences at the university. He would often give free public lectures on the subject of venomous animals and would distribute all of his published material without charge as a service to the university and the community as a whole. He also appeared on a weekly half-hour television series which lasted from 1954 to 1957 and he was paid $100 for each program. When he retired, the venomous research laboratory was moved from Arizona State University into a special room in his home. Petitioner did this so that he would not have to travel back and forth to the school and he would then be able to work longer hours on his research. In order to adequately continue on his research, he had to purchase a substantial amount of new equipment. In those first few years of operation he spent $925 on a research microscope with a camera adapter, $200 for a camera which could be used for microphotography, $284 for a microscope fiber light, and $485 for nine steel filing cabinets which were used to store the literature which he had accumulated over the years. Since 1972 his work has included research, writing, consulting, and lecturing on the subject *223 of venomous animals with special emphasis on scorpions. More particularly, he has written five articles with such titles as "A Redescription of Diplocentrus Whitei Systematics (Scorpionida, Diplocentridae)," and has authored a 30-page chapter on arthropod venoms in a book entitled, "Handbook of Experimental Pharmacology." of these six writings, petitioner was paid for one article and for the chapter. He has given 14 paid lectures from 1975 to 1979 to audiences ranging from gun clubs and high school students to a nurses association. Petitioner has acted as a consultant to a variety of individuals and organizations. He was paid to speak to Saint Luke's Hospital's emergency medical staff regarding the proper procedure for treating venomous bites and stings. Since 1979, he has been paid a retainer for his services by an attorney who represents a corporation whose employees have been accused of placing rattlesnakes in a mailbox in order to kill an individual. Petitioner's advice was sought by a cattle company located in Arlington, Arizona, that wanted to know whether its 1,000-acre ranch was safe from venomous animals and, if not, what they could do to protect the cattle. He *224 also has received two telephone calls from physicians who had questions about the proper treatment of venomous bites and stings. One was from a doctor in New Mexico who was having a difficult time treating a child who had been stung by a scorpion and he wanted to know what else he could do. The other was from a physician who had personally been bitten by a loxosceles spider and was growing weaker every day and he wanted to know how to prevent "the ultimate" from occurring. Petitioner did not charge either of these doctors a fee because he had always regarded himself as a gratis consultant to the medical profession. In 1966 petitioner completed a pamphlet entitled, "The Treatment of Venomous Bites and Stings." While he was employed by the university, it published the pamphlet without charge. Although he was not prohibited from setting a price, he gave them away free to the public upon request in order to promote the standing of the school. After his retirement, he began to charge $2.75 for the pamphlet because the university would no longer publish or distribute them without cost to petitioner. In order to facilitate the wider distribution of his pamphlets, he offered them at *225 a reduced price of $1.50 to interested retailers so that they in turn could sell at a profit. At the time of the trial of this case, only the National Park Service was purchasing them at wholesale and selling at retail to the public. After deducting his postage and printing expenses, petitioner still makes a profit of about 50 cents on each pamphlet sold in this manner. However, most of his sales were made at retail through two sources. While he often receives a fee, petitioner will lecture without charge to various groups but he will then offer his literature for sale at the conclusion of his talk to those in the audience who are interested. Arizona State University also sells the pamphlets and it established a special publication account in which to deposit the proceeds. The university has set up many accounts for various professors when they receive grant money from organizations such as the National Science Foundation or to record the income received from the sale of publications authored by a professor. The university also has a special auditor who supervises the accounts. Petitioner's account was created after he retired as a professor at the university and it was designated *226 as the "Venomous Animals Publication Account." The sales of the publications are made through the zoology department which answers all inquiries by sending out a list of petitioner's publications which are currently available. From this list people order the particular publication which they want and the zoology department in turn mails it out to them. After deducting the costs of postage, the net amount is credited to petitioner's account. Although the balance in the account belongs exclusively to him and he could demand payment at any time, petitioner asks the unviersity to publish other documents which he has written and it then deducts the publication expenses from the account. In addition to the sales proceeds, petitioner was also depositing all of his lecture fees into the account during 1975. He would then periodically ask for an accounting and would receive a computer printout listing the entries and amounts by date. Since his retirement, petitioner works on as many as three projects at one time. The most important is his research on the genetic affinity between species of scorpions. That is, he has set out to determine how closely related scorpions from all over the *227 world are in the hope of discovering their path of evolution. He has devised a formula which will measure one scorpion's similarity to another based on about 75 measurements taken from each specimen. These measurements are then translated into a quantity which is inserted in the formula. Under the formula, if two scorpions are identical, the result will be one. Anything less than one indicates the degree of dissimilarity and the comparison can even result in a negative number. Petitioner regards this study as a very important one because scorpions are the oldest living land animal. If his research proves successful, he plans to present his findings in both lecture and written form and anticipates substantial financial return from such writings and lectures. In the meantime, petitioner plans to continue actively pursuing his consulting work and lecturing and hopes to branch out into more popular writing. Since his retirement in 1972, petitioner has received social security payments. His income, apart from his social security payments and his research-related activities, has primarily been derived from his retirement pension and annuities and interest. His reported income from *228 these sources was as follows: Reported
Year
Income
1973
$ 6,854.53
1974
14,913.00
1975
16,078.00
1976
16,441.58
1977
16,663.71
1978
17,497.29
Petitioner's income and deductions reported on his income tax returns for the years 1972 to 1978 from his work as a researcher, consultant, author, and lecturer are as follows: Year
Income
Expenses
Profit (Loss)
1972
$1,375.65
($1,375.65)
1973
$210.00
824.30
(614.30)
1974
3,106.00
(3,106.00)
1975
496.40 [2]
3,917.00
(3,420.60)
1976
346.00
3,624.57
(3,278.57)
1977
977.83
3,536.38
(2,558.55)
1978
661.24
3,470.88
(2,809.64)
In his notice of deficiency for 1975, respondent increased petitioner's taxable income by $3,917 less the amount of $207 which petitioner had included in income in 1975 representing a refund of a previous year's Federal income tax. Respondent explained that deductions are allowable under section 162 as trade or business expenses only if the business is carried on for profit. [3]
*229 OPINION The only issue for decision is whether petitioner engaged in activities of writing, researching, lecturing, and consulting for a profit. Section 183(a) provides that if an individual does not engage in an activity for profit then deductions arising out of such activity shall be disallowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." [4] If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). *230 In order for petitioner to prevail, he must establish that he engaged in the activity with the primary purpose and intent of making a profit. Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), affirming a Memorandum Opinion of this Court; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425 (1979); Allen v. Commissioner, 72 T.C. 28, 33 (1979). Petitioner's expectation of profit need not be a reasonable one but he must have a bona fide expectation of realizing a profit. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, supra at 666; Golanty v. Commissioner, supra at 425-426; Allen v. Commissioner, supra at 33; Churchman v. Commissioner, 68 T.C. 696, 701 (1977); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). In determining whether the taxpayer engaged in the activity for profit, all of the relevant facts and circumstances are to be taken into account. Section 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner, supra at 426; Allen v. Commissioner, supra at 34; *231 Jasionowski v. Commissioner, supra at 319. While no one factor is to be determinative, greater weight should be given to objective facts than to the taxpayer's mere statement of his intent. Section 1.183-2(a) and (b), Income Tax Regs.; Engdahl v. Commissioner, supra at 666; Churchman v. Commissioner, supra at 701. Section 1.183-2(b), Income Tax Regs., lists a number of relevant factors, which were basically derived from prior case law, to be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 383 (1974). The factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; *232 and (9) whether elements of personal pleasure or recreation are involved. Respondent contends that petitioner is not engaged in a business for profit but rather is a retired academician who is merely continuing his lifelong interest in the research of venomous animals and charging nominal fees for his work in order to help defray his out-of-pocket expenses. Petitioner argues that while his efforts as a researcher, author, lecturer, and consultant have not proved profitable up to this time, his hard work will be rewarded with substantial income if his research proves successful and he discovers the path of evolution of scorpions. Before turning to the facts of this case, it is helpful to review the legislative history of section 183. It was enacted as a replacement of section 270, the so-called "hobby loss" provision, in order to prevent taxpayers from reducing unrelated personal income with deductions generated from nonbusiness activities. The intent of Congress was to reduce the uncertainty in the prior law by providing a more objective basis for distinguishing between business and hobby losses. The House version of the bill provided that the loss would not be deductible *233 if the activity was not carried on with "a reasonable expectation of realizing a profit." H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 245. The Senate, however, rejected this language as too restrictive and instead stated that the test should be whether the "activity is not engaged in for profit." S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 490. The committee report explained that the change-- will prevent the rule from being applicable to situations where many would consider that it is not reasonable to expect an activity to result in a profit even though the evidence available indicates that the activity actually is engaged in for profit. For example, it might be argued that there was not a "reasonable" expectation of profit in the case of a bona fide inventor or a person who invests in a wildcat oil well. A similar argument might be made in a case of a poor person engaged in what appears to be an inefficient farming operation. The committee does not believe that this provision should apply to these situations or that the House intended it to so apply, if the activity actually is engaged in for profit. [S. Rept. No. 91-552 (1969), 1963-3 C.B. at 489-490.] *234 The legislative history shows that Congress was concerned that an individual should not be denied a deduction simply because the profitability of the activity depends on the success of a speculative long-term project. An example of this type of activity is found in section 1.183-2(c), example 6, Income Tax Regs., in which the regulations describe a chemist who works in his home in his spare time on the development of new types of plastics. He had conducted his research in a systematic manner and had spent a substantial amount of time and money on his projects. Although he had not received any income, he had obtained several patents on his work and attempted to market his developments. The example concludes that due to the time and effort expended and his expertise, he may be engaged in this activity for profit. The facts in the instant case are very similar to those of the chemist. Petitioner is regarded as an expert in the field of venomous animals. He has spent over 30 years studying and teaching about these animals with a particular emphasis on scorpions. He had two notable successes resulting from his research--one, the discovery of the detrimental effect of morphine on *235 children who had been bitten by a scorpion, and the other, an anti-venom for scorpion stings. After petitioner retired from his teaching duties in 1972, he moved his laboratory to his home so that he could devote more time to his work. In addition to the equipment which he already owned, he purchased a research microscope, fiber and cold lights, and many steel filing cabinets which were used for storing the large amount of data he had accumulated for his research. Petitioner devoted a substantial amount of his time to his research and, like the chemist in the example, has conducted his research in a systematic manner. While he had not received any income attributable to his long-term project of charting the path of evolution of scorpions, he stated that if his study proves successful, his income from his writings and lectures will increase dramatically. In the meantime, he has received income from articles, lectures, and sales of his pamphlet on venomous animals and has used various methods to market these pamphlets and remain active as an author and lecturer. [5]
Turning to the specific factors listed *236 in the regulations, respondent concedes that petitioner is an expert in the field of venomous animals and has carried on his research in accordance with accepted scientific practices in this area. He also properly agrees that petitioner has devoted a substantial amount of his personal time and effort to his research and related work as an author and lecturer. Respondent contends, however, that petitioner does not carry on his activities in a businesslike manner because he did not maintain accurate books and records and failed to charge the medical profession a fee for his services. The record indicates that while petitioner may not have maintained a well organized set of books, he certainly attempted to keep an accurate account of his income and expenses. For the years 1973 and 1975 through 1978, petitioner preseted detailed lists of the income which he collected. They showed the date of the transaction, the name of the payor, the type of activity which produced the income, and the amount in dollars and cents. The balance of his income earned resulted from the sale of his pamphlets by Arizona State University. Records of these dales were maintained by the university through *237 a special account created for petitioner. This account was credited with all sales made by the university and it was reduced for the postage and printing expenses. Petitioner then received on request a computer printout which provided a detailed list of the transactions. The remaining balance in the account belonged exclusively to petitioner and he could withdraw the money at any time. Section 1.183-2(b)(1), Income Tax Regs., states that a change of operating methods or the adoption of new techniques indicates that the activity was carried on in a businesslike manner. Petitioner began selling his pamphlets directly to the public at $2.75 each. In order to get a wider distribution, he contacted the National Parks Service about the sale of the pamphlets through their offices. Their policy was to only purchase products at wholesale so that they could sell them to the public at a profit. Petitioner agreed and adopted a new policy of selling at a discount to retail outlets and stated that he still makes about 50 cents on each pamphlet. The fact that petitioner did not charge a fee for his requested advice by two medical doctors regarding the proper treatment of venomous bites *238 does weigh against his argument that he carried on the activity in a businesslike manner. However, it is important to consider the nature of the calls. One was from a physician who was treating a child who had been stung by a scorpion and he wondered if there was anything else he could do in addition to what had been done already. The second call was from a physician who had personally been bitten by a poisonous spider and was growing weaker every day. The doctor wanted to know if there was any treatment which could prevent "the ultimate" from occurring. Petitioner explained that because he had always been a consultant to the medical profession when he was employed as a professor at Arizona State University, he had developed a "bad habit" of not charging for his services but that he would change and had in fact been paid by a hospital for a lecture in 1979. In view of the fact that he did keep accurate records, reduced the price of his pamphlets, and has been trying to adjust to being a businessman rather than a professor serving the medical community, petitioner did carry on the activity in a businesslike manner. The sixth factor in the regulations focuses on the taxpayer's *239 history of income or losses from the activity. Respondent argues that petitioner's large and continuous record of losses from his activity are persuasive evidence that he was not engaged in this activity for profit. Golanty v. Commissioner, 72 T.C. 411, 426 (1979). It is undisputed that petitioner did report a loss in each year of operation. However, there are two important facts in this case which would be considered with respect to these losses. First, section 1.183-2(b)(6), Income Tax Regs., states that losses incurred during the start-up phase of a business are not necessarily indicative of a lack of profit motive. A significant amount of petitioner's total deductions were attributable to his travel expenses incurred to collect scorpion samples and to depreciation on his equipment which was purchased in order to complete his laboratory. Second, these losses should be viewed in the context of the nature of petitioner's activity. Like the example of the research chemist in the regulations, it is clear that if profits ever do result, they will do so only after years of diligent research. Thus, a history of losses in activities such as research, inventing, or *240 art should be given less weight than in other areas. Churchman v. Commissioner, supra at 701. Respondent argues that another factor negating petitioner's profit motive was that petitioner was not dependent on his post-retirement activities for financial support. Section 1.183-2(b)(8), Income Tax Regs., states that the concern is whether the taxpayer has substantial income or capital from other independent sources, particularly if the activity is generating substantial tax benefits, not whether the taxpayer is dependent on the activity for his support. In the present case, petitioner's pension and annuity income has ranged from about $7,600 to $17,500 during the years of his research and he reported $16,078 in 1975, the year in issue. It is important to recognize that while he has had a relatively modest income, he has spent a significant amount of out-of-pocket money on his research activities.In fact, this Court has stated that "[we] think it is unlikely that petitioners would embark on a hobby costing thousands of dollars and entailing much personal physical labor without a profit motive." Engdahl v. Commissioner, supra at 670. *241 Considering the record as a whole, we conclude that petitioner had a genuine hope, although it nonetheless may have been unreasonable, of producing a profit and that he was therefore engaged in the activity for profit in 1975.Accordingly, we conclude that the expenses incurred by petitioner in 1975 in connection with his writing, lecturing, consulting, and research activities are fully deductible. Decision will be entered for the petitioners. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise stated.↩
2. Although the income was not separately reported on his return, petitioner testified that he had included it under "Pensions and annuities."↩
3. Although respondent in his notice of deficiency mentioned the above basis for disallowance of the claimed deductions, his primary reason for the disallowance was stated in the notice of deficiency to be that because the expenses related to a book petitioner hoped to publish they had to be capitalized in accordance with Rev. Rul. 68-194, 1968-1 C.B. 87. At the trial respondent's counsel stated that respondent took the position -- that should this Court find that Dr. Stahnke * * * was a professional author during 1975 engaged in such activity for a profit, then those expenses claimed on the 1975 tax return * * * are capital expenditures pursuant to Section 263 of the Code. * * * On brief respondent stated that he no longer maintains the above-stated position and "now concedes that should petitioner be found to be engaged in an activity for profit, the claimed research expenses would be deductible." Respondent at the trial concluded that petitioner spent the amounts claimed to be deductible in connection with his activities of writing, lecturing, consulting, and research.↩
4. Sec. 183(a) through (c) reads as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under prragraph (1) or (2) of section 212.↩
5. See Bailey v. Commissioner, T.C. Memo. 1963-251↩.