WAYNE ARDEN MAHR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mahr v. Commissioner
Docket No. 17712-80.
United States Tax Court
T.C. Memo 1982-297; 1982 Tax Ct. Memo LEXIS 455; 43 T.C.M. (CCH) 1519; T.C.M. (RIA) 82297; May 26, 1982. Wayne Arden Mahr, pro se. Claire Priestley-Cady, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1977 in the amount of $ 2,723. The issues for decision are (1) whether, during the calendar year 1977, petitioner's activities with respect to dog breeding and showing constituted a trade or business or an activity engaged in for profit; (2) if petitioner's activities with respect to his dog breeding and showing constituted a trade *457 or business or transaction entered into for profit, whether petitioner is entitled to a deduction for depreciation with respect to dogs which he bred and raised and for a sales tax paid with respect to a motor home he purchased; and (3) whether petitioner is entitled to an investment credit under section 38[1] on a shipping crate, a dog pen, and a motor home. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in Newark, California, at the time of the filing of his petition in this case, filed a joint Federal income tax return for the calendar year 1977 with his late wife, Sue L. Mahr. Mrs. Mahr was killed in an automobile accident in 1979. During the entire year 1977, petitioner was employed full time as an administrative analyst by the City of Oakland, California, and received gross income in the amount of $ 19,027.84. He had been employed in this capacity for some years prior to 1977. He was also attending classes in the evening working toward a master's degree *458 in Public Administration. During the entire year 1977, Sue L. Mahr was employed full time as an eligibility technician supervisor for the Alameda County Welfare Department. She received gross income from this employment in the amount of $ 15,180.80 in the year 1977. Mrs. Mahr had been employed with the Alameda County Welfare Department for some years prior to 1977. Mrs. Mahr had an interest in animals all her life. In 1966 one of her co-workers who was moving away from the San Francisco, California, area gave Mrs. Mahr her interest in a registered female Afghan hound (Afghan). Mrs. Mahr's co-worker was moving to a home in Phoenix, Arlizona, where she could have only one dog on the premises. At the time she had two Afghan hounds, one of which was a female. After talking with Mrs. Mahr, the co-worker decided that Mrs. Mahr would give a good home to the female Afghan, so she gave the dog to Mrs. Mahr. The dog given to Mrs. Mahr had been shown in dog shows, but petitioner and Mrs. Mahr never showed the dog. After Mrs. Mahr was given the dog, it developed that the co-worker who gave her the dog only owned a part interest in the dog and that the remaining interest was owned by *459 a woman who had owned and bred Afghan hounds for many years. The dog given to Mrs. Mahr was registered with the American Kennel Club. This was a requirement for a dog to be shown in shows sponsored by that club. The dog given to Mrs. Mahr was named Shado. In 1969, Shado was bred to a registered male Afghan owned by the individual that owned a part interest in Shado. In 1969 Shado produced five puppies. Shado's co-owner took two of the puppies and petitioner and his wife kept the other three. Two of the puppies kept by petitioner and his wife were male and one was a female. One of the male puppies was mismarked and petitioner and his wife sold that puppy to an individual who wanted it as a pet. They kept one male and the female Afghan puppy. During the period 1970-1972, petitioner and his wife showed these puppies on a number of occasions. They showed the puppies strictly as a hobby and also put the puppies in certain matches. The female was a very good show dog. This female was named Ghahyl Shado's Khassandra (Shado's Khassandra). In 1974 petitioner and his wife bred Shado's Khassandra to a registered Afghan hound named Kismet's Arabian Knight. On April 4, 1974, Shado's *460 Khassandra produced a litter of four male and three female puppies. At the same show in which the sire of Shado's Khassandra's litter finished his championship, petitioner and his wife advertised the five puppies they had retained from the litter of Shado's Khassandra for sale. One of the male puppies was sold to a wealthy person who lived in Palo Alto, California, as a pet since petitioner and his wife thought the puppy would have a good life with such an owner. On August 10, 1974, a half interest in a second of the male puppies was sold to an individual who answered the advertisement petitioner and his wife had placed with respect to the puppies. This individual was named Wendy Maher. Ms. Maher was to keep and look after the dog and was to show the dog. A half interest in the third male was sold to an individual named Sharon A. Stivers. He was shown by Ms. Stivers and won several shows. One of the females was sold and petitioner and his wife kept the other female. Of the five puppies kept by Mr. and Mrs. Mahr of Shado's Khassandra's litter, they retained a complete interest in only one. Late in 1973 or early in 1974, when petitioner and his wife arranged to breed Shado's *461 Khassandra, they decided that they would go into the dog breeding business. The dog they selected to breed to Shado's Khassandra was considered to be of high quality. They paid a $ 200 stud fee to breed Shado's Khassandra to this dog. The Mahrs began to go to more dog shows. They joined the Monterey Bay Afghan Hound Club in 1975 and the American Dog Owners Association in 1976. They attended several breeders' seminars in 1975 and 1976 and some regional conventions of the American Kennel Club. They began showing their dogs more often. In 1975, petitioner and his wife had been in Phoenix, Arizona, where petitioner was attending a public administration conference. While they were there, they went to an Afghan hound show and met some people interested in Afghans. In 1976 they decided to go to a show in Phoenix and show their dogs in Phoenix and Scottsdale. When they went to dog shows, they would spend most of their time preparing their dogs to be shown and showing the dogs. It was also necessary to train the dogs before they were taken to shows and petitioner and his wife would work with training the dogs and would also take them to training classes. When petitioner and his *462 wife got their first Afghan hound, they lived in Oakland, California. In 1972 they moved to Castro Valley, California, where they would have a larger place if they decided to breed Shado's Khassandra. They lived in Castro Valley until 1976. In 1976 petitioner and his wife bought a place in Newark, California. They had seen the place in 1974 which had dog kennels built in the back of it.When they learned in 1976 that this place was for sale, they bought it. Some of the puppies which had been sold to co-owners in 1974 were returned to the Mahrs. Both of the males they sold on co-owner agreements came back to them in 1977 while they still had one male they had retained from Shado's litter born in 1969. The female puppy they sold from the 1974 litter also came back to them, and at one time in 1977 they had four females. Petitioner and his wife did not believe that they should keep over three female dogs and therefore in 1977 gave one of the females to a person they thought would provide a good home for the dog, with the understanding that the female would not be bred. The Mahrs continued to show the dogs they had and in 1977 attended a number of dog shows outside of the San *463 Francisco area as well as shows around the San Francisco area. Petitioner's wife, continuing the interest in animals she had always had, became an officer in an Afghan Hound Club and became very interested in rescue work for that club. At that time, abandoned Afghan hounds were becoming a problem. Mrs. Mahr was recognized for her rescue work by the National Afghan Hound Club and at the time of her death in 1979 petitioner and his wife were going to be sponsored for membership in the Afghan Hound Club.
It was not recommended that Afghan females be bred more than once every 2 years and, in petitioner's opinion, an Afghan female should not be bred more than twice in her lifetime. The average life of an Afghan female is 11 years. The code of ethics of the Afghan club called for limiting the breeding of Afghan females, but, in spite of that, there were some breeders who turned out a litter of puppies from each female they owned every year. No prize money is given at the showing of Afghan hounds. Although petitioner has on occasion handled a dog for another person at a show, he has never charged a handler's fee. There are individuals who charge a handler's fee of as much as $ 100 *464 for showing a dog at a show. The area in which petitioner lived in Newark, California, was zoned residential. Certain forms of home occupation would be permitted in the area if a permit was obtained.Petitioner never obtained a permit for operation of his kennel since he did not think the number of dogs he kept required such a permit. The City of Newark had a regulation prohibiting anyone from having a boarding kennel in the area where petitioner lived. Petitioner occasionally boarded a dog for a friend, but he never considered that he operated a boarding kennel. Petitioner intended to make any money he made with respect to his Afghan hounds from stud fees and sales of puppies. The first claim by petitioner and his wife to a loss deduction with respect to their Afghan hound activities was on their 1974 income tax return. The following schedule shows the amounts reported as income and expenses by petitioner and his wife from their dog breeding and showing activities on their tax returns for the taxable years 1974 through 1977: Year
Gross Receipts
Expenses and Depreciation
Loss
1974
$304
$3,584
$ 3,280
1975
520
5,117
4,597
1976
350
6,503
6,153
1977
200
10,237
9,437
*465 In addition to the $ 200 in gross receipts petitioner and his wife reported in 1977, they also reported income of $ 600 as recapture of depreciation on a dog they gave to their daughter as a gift in 1977. The receipts in 1974, 1975, and 1976 reported by petitioner and his wife were from the sale of puppies. The $ 200 reported in 1977 consisted of a $ 150 stud fee and $ 50 boarding charge. During the period from January 1, 1974, through December 31, 1977, petitioner and his wife had only one of their dogs bred, producing the litter of seven puppies born on April 4, 1974. The only other litter which had been born to their dogs up to the time of the trial of this case was a litter born in 1978.
Petitioner and his wife, on their joint 1977 Federal income tax return, claimed a business loss of $ 9,437 which was shown on a Schedule C attached to their return. On this Schedule C they listed various expenses totaling $ 5,609, and claimed a depreciation deduction totaling $ 4,628 consisting of claimed depreciation with respect to their dogs of $ 1,171. In addition, petitioners claimed depreciation with respect to certain fixtures in connection with the kennel. In computing their tax, *466 petitioner and his wife claimed an investment credit of $ 409, which amount was computed on Form 3468 attached to their return. Respondent in his notice of deficiency to petitioner and his wife disallowed the claimed loss deduction with respect to their Afghan hound activities with the following explanation: It has been determined that expenses incurred in connection with your dog breeding activity were not incurred or paid in connection with an activity entered into for profit. Therefore, the $ 9,437.00 shown on your return as a loss is not allowable under section 183 of the Internal Revenue Code. Therefore, your taxable income is increased $ 9,437.00. Respondent, in the alternative, determined that if the dog breeding activity is determined to be an activity entered into for profit, depreciation in the amount of $ 1,171 claimed on the dogs is not allowable since the Mahr's basis in the dogs is zero, and that the sales tax on a motor home in the amount of $ 384.22 deducted by them is a capital expenditure to be amortized over the life of the motor home and a deduction allowable to the extent of $ 18.30. Respondent further determined that the amount *467 of $ 409 claimed as investment credit on a shipping crate, a dog pen, and the motor home is not allowable since these items do not qualify for the investment credit under section 38 of the Internal Revenue Code. OPINION It is respondent's position in this case that the dog breeding and showing activities engaged in by petitioner and his wife did not constitute a trade or business or activities engaged in for profit within the meaning of section 212. For this reason respondent contends that petitioner is entitled only to deductions allowed under section 183(b). Section 183(a) provides that if an individual does not engage in an activity for profit, the deduction arising out of that activity shall not be allowed except to the extent provided in section 183(b). [2]Section 183(b) provides that, in the case of an activity not engaged in for profit, there shall be allowed the deductions which would be allowable without regard to whether such activity is engaged in for profit and other deductions which would be allowable if the activity were engaged in for profit *468 only to the extent of gross income derived from the activity during the taxable year. In effect, this section allows a taxpayer to deduct as itemized deductions such items as taxes and interest which are allowable whether or not connected with a trade or business or an activity engaged in for profit, but does not permit the taxpayer to take a loss deduction from operating expenses, depreciation, and other typical expenses which are allowable only in connection with a trade or business or an activity engaged in for profit. *469 Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212(1) or (2). It is therefore necessary for us to determine whether the activities of petitioner and his wife, with respect to the breeding and showing of Afghan hounds, was a trade or business within the meaning of section 162 or, if not, whether it was an activity engaged in for profit within the meaning of section 212. [3]
It is well settled that for an activity to constitute the carrying on of a trade or business, such activity *470 must be entered into in good faith with the dominant hope and intent of realizing a profit therefrom. Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Although the profit motive need not be reasonable, it must be bona fide in order for a taxpayer to be entitled to deduct losses arising from the activity. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1970). Since a profit motive is necessary in order for an activity to constitute a trade or business and is also necessary under section 212 for an activity to be engaged in for the production of income, if no profit motive exists with respect to an activity, such activity is neither a trade or business nor an activity engaged in for the production of income within the meaning of section 212. Whether a taxpayer possesses the required profit motive or intent for his activity to either constitute a trade or business or an activity entered into for the production of income is a question of fact to be decided from all the evidence in the particular case. *471 United States v. Pyne,313 U.S. 127 (1941); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). In making this factual determination, more weight must be given to the objective facts than to the mere statements of the parties. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2, Income Tax Regs., lists nine factors to be considered in determing whether an activity is engaged in for profit. These factors were derived from cases decided prior to the enactment of section 183 and are factors to be considered along with all other evidence of record. Benz v. Commissioner,63 T.C. 375, 383 (1974). The factors listed in section 1.183-2, Income Tax Regs., are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in *472 the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses from the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. The record here shows that petitioner and his wife did not carry on their dog breeding and showing activities in a businesslike manner. Petitioner testified that they expected to make a profit, both from stud fees and the sale of puppies. However, several puppies were given away and it is clear that the major interest of petitioner and his wife with respect to the puppies was that the dogs have a good home. The record does indicate that petitioner's wife had been interested in animals all her life, but otherwise shows no expertise in either petitioner or his wife with respect to dog breeding and showing. Petitioner testified with respect to the many shows that he and his wife attended and the many people engaged in the raising of Afghan hounds with whom he and his wife visited and talked. However, the clear implication from petitioner's *473 testimony is that most of these individuals were dog fanciers engaged in showing Afghan hounds as a hobby. There is no showing of any expectations petitioner and his wife might have had that any assets used in the activity would appreciate in value or that petitioner and his wife had ever carried on any similar activities or any dissimilar activities other than employment.Clearly, the history of the losses from the activity do not indicate any profit motive, nor do the amounts of the occasional profits. The record shows that petitioner and his wife were both gainfully employed and therefore financially able to breed and show Afghan hounds. Although there is nothing in the record to show the amount of time they devoted to their dogs, the indication is that much of their spare time was spent training, showing, or grooming their dogs.It is clear that they received personal enjoyment and gratification from the showing of these dogs. Judged on the factors contained in section 183, the conclusion is inescapable that the activities of petitioner and his wife with respect to the Afghan hounds were not engaged in for profit. We have, however, considered the record as a whole to determine *474 whether there are any other objective indications that petitioner and his wife might have been engaged in the activity for profit. Petitioner testified that in an activity such as raising and showing Afghan hounds, you could not expect a profit for approximately 10 years. However, there is nothing in this record to indicate that petitioner's method of pursuing the activity could in any way be expected to result in a profit, even after 10 years. When petitioner and his wife purchased a new home in 1976 that had a kennel connected with it, it was in an area in which they could not have a commercial dog breeding operation and, as petitioner testified, could not accommodate more than three female dogs at any one time. Petitioner testified that he would never breed a female more than twice during her lifetime. He further testified that there was an oversupply of Afghan hounds and the Afghan Hound Club discouraged excessive breeding of Afghans. We have considered this testimony together with all the other evidence of record and petitioner's other statements which indicate a clear hobby activity. Based on the record as a whole, we conclude that petitioner and his wife were not engaged *475 in the activities with respect to Afghan hounds during the year 1977 with any profit motive or bona fide intent to make a profit. For this reason, we conclude that petitioner's activities with respect to Afghan hounds in 1977 were not activities with respect to which deductions are allowable under section 162 or under section 212(1) or (2). Having decided that petitioner and his wife are not entitled to any deductions with respect to their activities in connection with Afghan hounds, except as allowed under section 183(b), it is unnecessary to decide the alternative issues raised by respondent with respect to depreciation and the deduction of the sales tax with respect to the mobile home. Likewise, since we have concluded that petitioner and his wife were not engaged in a trade or business or an activity for profit with respect to the Afghan hounds, it is clear that they are not entitled to any investment credit with respect to the mobile home which they used in connection with their Afghan hounds activity or the shipping crate or dog pen used in that activity, regardless of whether these items would qualify under section 38 if the activity were a business or one engaged in for *476 profit. A review of the tax return of petitioner and his wife indicates that they did claim the deduction for the sales tax on the mobile home and any interest paid in connection therewith as a deduction on Schedule A of their tax return and not as a part of their claimed business expense deduction on Schedule C. Respondent has only disallowed the loss claimed by petitioner and his wife from their afghan hound activities, thereby in effect allowing a deduction for the expenses incurred with respect to the activity to the extent of the income therefrom reported by petitioner and his wife. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
2. Sec. 183(a) and (b) provides as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
3. Sec. 212(1) and (2) provides as follows: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income. (2) for the management, conservation, or maintenance of property held for the production of income * * *.↩