GEORGE H. DOYLE AND LOIS DOYLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doyle v. Commissioner
Docket No. 5047-81.
United States Tax Court
T.C. Memo 1982-694; 1982 Tax Ct. Memo LEXIS 59; 45 T.C.M. (CCH) 231; T.C.M. (RIA) 82694; November 29, 1982. Towner Leeper and David Leeper, for the petitioners. John F. Eiman, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1976, 1977 and 1978 in the following amounts: [1]
*61 Taxable Year
Deficiency
1976
$25,660.00
1977
26,945.33
1978
15,681.01
All other issues for taxable years 1976, 1977 and 1978 have been settled. The sole issue for decision is whether losses sustained by petitioners for taxable years 1976, 1977 and 1978 in their horse operations are deductible losses from a trade or business under sections 162 and 165(a) and from an activity carried on with an actual and honest profit objective under section 183. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and stipulated exhibits are incorporated herein by this reference. Petitioners, husband and wife, filed joint Federal income tax returns for the taxable years 1976, 1977 and 1978 with the Director, Internal Revenue Service, Austin, Texas. Petitioners resided in El Paso, Texas, when they filed their petition with this Court. The issue before us concerns loss deductions taken by petitioners for the taxable years 1976, 1977 and 1978. These losses were generated by the operation of a horse ranch. George Doyle, petitioner husband, was also *62 employed by Southwestern Sheet Metal Works, Inc. (Southwestern), from 1957 until July 1978. Petitioners lived in a residential subdivision in El Paso, Texas, prior to 1970. They had two ordinary horses which cost between $100 and $300 each. These horses were boarded on a farm. Petitioners took their children to the farm to ride on weekends primarily for recreational purposes. Mr. Doyle had ridden horses previously for pleasure. Mrs. Doyle did not ride at all. In 1970, petitioners purchased and moved to a five-acre lot with the general intention of doing more with the horses. Recognizing their inexperience, over the next two years they consulted professional trainers who advised them that in order to have horses valuable for business or breeding they had to acquire registered American Quarter Horse Association (AQHA) champions. Petitioners did not have registered quarter horses at that time and could not afford to buy an AQHA champion, so they decided to start their horse business at an intermediary level and gradually upgrade the quality of their horses. Between 1972 and 1975, they purchased three AQHA-registered horses for $500 to $700 for the purpose of developing AQHA *63 mares which could be used for breeding. This was done by hiring professional trainers to train the horses further and to work with their children who actually rode the horses in each AQHA-approved horse show. They learned about these shows through various horse journals they read, and from their trainers. These shows were judged by professional judges. Placing high in a competition meant AQHA "points" and increased the value of their horses. By 1975 they had used several trainers but were unable to earn any AQHA points with these horses. For eight months of each year petitioners and their three children traveled each weekend in their horse trailer to horse shows throughout the southwest. The family slept on a mattress which they installed in their horse trailer. Petitioners typically would need to be at a horse show at 6:00 or 6:30 in the morning and would stay until 8:00 or 9:00 at night. In order to arrive at the shows on time, the family often left their home in El Paso on Friday afternoons. Sometimes Mr. Doyle left his job at Southwestern early on Fridays to accompany the family. This caused some problems with his employer. The eldest child sacrificed extracurricular *64 activities at school and gave up a part-time job to prepare for and attend the shows. The children also worked before and after school each day caring for the horses and working in the alfalfa field. From the beginning of their small ranching operation, the entire family groomed, fed and watered the horses, and cleaned their stalls and tack. They dug a well, installed a pump for irrigation and raised alfalfa on three acres of their property when they determined that this would reduce their feed costs. Mrs. Doyle, petitioner wife, supervised most of the horse business activity since Mr. Doyle continued to hold his full-time job with Southwestern. She became very knowledgeable about the horse show circuit and kept detailed notes on the horses. Among things she recorded were names of judges who tended to vote for her horses and how well each horse performed at a show. She also kept all veterinarian-related papers. Mrs. Doyle devoted enormous time and energy to all aspects of the business including the actual physical labor required in the care and feeding of the horses and in cultivating the alfalfa field. Acting on the advice of a certified public accountant, Mrs. Doyle *65 began writing checks for all horse-related expenses. All receipts were separated. Petitioners maintained detailed and thorough financial records of their horse-breeding operation. Petitioners expected that it would take at least two to three years to develop an AQHA champion, another year to have her bred and produce a foal [3] and then another six to eight months before a foal could be sold. When petitioners had not received any show points by 1976 they met with a new trainer of national prominence. They then decided to purchase three new AQHA-registered mares with higher ratings and some AQHA points, ranging in price from $5,000 to $7,500. By 1978 the petitioners had produced assets of value. One of their horses had become an AQHA champion and produced a foal. That same year another mare that was about to reach champion status died. Then, their AQHA champion died of colic in 1979. When the champion horse died, petitioners did not reinvest the insurance proceeds from the horse in new AQHA horses because of other significant, unrelated legal financial obligations. Instead they discontinued the horse operations. *66 [4] Together, petitioners began another business in which they now work twelve hors a day. The petitioners reported the following results from their ranching operations: Year
Profit (Loss)
1971
$ (609.00)
1972
(661.00)
1973
(1,769.22)
1974
(3,081.88)
1975
(4,984.67)
1976
(13,478.00)
1977
(18,636.00)
1978
(11,169.56)
1979
* 5,660.33 On their income tax returns, petitioners deducted losses of $13,478 in 1976, $18,636 in 1977, and $11,169.56 in 1978 resulting from their horse-breeding operation. In his notice of deficiency, the Commissioner disallowed farm deductions of $14,228 in 1976, $18,636 in 1977 and $11,169.56 in 1978 based on his conclusion that petitioners' horse operation was an activity not engaged in for profit. ULTIMATE FINDING OF FACT The primary objective of petitioners in owning and showing the horses *67 during the taxable years in question was to make the horses valuable through showing in order to breed them, sell the foals and make a profit. OPINION The only issue presented is whether petitioners' quarter horse operation was an "activity * * * engaged in for profit" within the meaning of section 183(a). The Commissioner determined that petitioners' business was not engaged in for profit. Petitioners bear the burden of proving the Commission's determination erroneous. Welch v. Helvering,290 U.S. 111 (1933). Section 183 was enacted to introduce a more objective standard in cases of this nature. [5] It provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." [6] An activity not engaged in for profit is defined in section 183(c) as: *68 SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. The standard for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the taxpayer engaged in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), on appeal (D.C. Cir., June 1, 1982). Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer had the requisite intent. Dreicer v. Commissioner,supra at 645. The existence of the requisite intent is a factual question which must be determined upon the record. Boyer v. Commissioner,69 T.C. 521, 537 (1977); Benz v. Commissioner,63 T.C. 375 (1974); Rule 142(a), Tax Court Rules of Practice and Procedure.
Horse *69 breeding, raising and showing horses for sale, may constitute a trade or business. Commissioner v. Widener,33 F.2d 833 (3d Cir. 1929), affg. 8 B.T.A. 651 (1927); Wilson v. Eisner,282 F. 38 (2d Cir. 1922). In Engdahl v. Commissioner,72 T.C. 659 (1979), we held, on strikingly similar facts, that an American saddle-bred horse-breeding operation was an activity engaged in for profit, thereby allowing the deduction of losses. The taxpayers in Engdahl became involved with horses when their eldest daughter began riding lessons. They started the business as a means of supplementing the income of the husband, an orthodontist, as his retirement became imminent. They began by consulting trainers and breeders as to the local market for breeding and selling horses. Starting with four horses, they eventually purchased a ranch containing facilities for the horses. From 1964 to 1973, taxpayers registered ten purebred, American saddle-bred horses with the American Saddle Bred Registry in Louisville, Kentucky. During this period the broodmares produced eleven live foals and four stillborn. By 1973, two of the live offspring *70 had died, three had been sold and the taxpayers had only nine horses. The husband and wife taxpayers did most of the work on the ranch themselves averaging 35 to 55 hours per week. Taxpayers entered their horses in horse shows and won trophies, ribbons and small amounts of prize money. They maintained separate books on the advice of a certified public accountant. Dur to adverse circumstances such as the untimely death of two of their best horses and unfavorable market conditions they incurred a series of uninterrupted losses. On these facts we held that this activity was engaged in for profit. This case is also a good illustration of the nature of horse-breeding activities. The regulations contain relevant factors for consideration in determining whether an activity is engaged in for profit. They are, in large part, a synthesis of prior case law. [7]Section 1.183-2(b), Income Tax Regs., includes the following factors: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate *71 in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Petitioners assert that an analysis of the relevant factors enumerated in section 1.183-2(b), Income Tax Regs., leads to the conclusion that their ranching activity was engaged in for profit. Respondent, pointing to the same factors, argues the operation was not entered into or continued for profit. We believe that the record considered as a whole reveals that petitioners' horse activities were entered into with the objective of making a profit. An analysis of the relevant factors as applied to petitioners' horse operations is as follows: Factor (1): Manner in Which the Taxpayer Carries on the Activity.
Section 1.183-2(b)(1), Income Tax Regs., provides in pertinent part: The fact that the taxpayer carries on the activity in a businesslike manner *72 and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. * * * Acting on the advice of a certified public accountant, Mrs. Doyle began writing checks for all horse-related expenses. All receipts were separated. Petitioners maintained detailed and thorough financial records of their horse-breeding operation. Petitioners educated themselves on the various alternatives involved in breeding and raising horses for profit. Upon consulting professional trainers and breeders they learned that in order to have a profitable horse business they had to go the professional show route with expensive AQHA-registered show horses. In 1972 they started by acquiring three registered quarter horses with some training. They then hired professional trainers to train the horses further, work with the children and prepare them for the horse shows. Mrs. Doyle, who did not ride, became very knowledgeable about the horse show circuit and kept detailed notes on each horse's performance *73 and on each judge who voted for her horses. She devoted enormous time and energy to the entire business and took an active role in the care and feeding of the horses on the ranch. We conclude that petitioners carried on the activity in a businesslike manner and maintained accurate books and recores. Factor (2): Expertise of the Taxpayer of His Advisors.
Section 1.183-2(b)(2), Income Tax Regs., provides in relevant part as follows: Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * * Mr. Doyle had done some horseback riding for pleasure. Mrs. Doyle did not ride at all. Neither one initially knew much about the horse business. Recognizing this fact, they consulted breeders and hired trainers to assist them in starting up the business and developing their horses into high-ranking AQHA champions. They consulted a certified public accountant and relied on his advice as to keeping separate orderly records. Respondent contends that petitioners *74 did not have a profit objective because they made all the ultimate business decisions themselves. This argument is without merit. When petitioners discovered that they could substantially reduce their fixed costs by growing their own alfalfa, they converted the three-acre lot adjacent to their home into an alfalfa field. The entire family watered, fertilized and tended the filed. They also minimized travel expenses by sleeping in a converted horse trailer. We find that petitioners prepared for the activity and considered economic consequences in a way that is consistent with a profit objective. Factor (3): Time and Effort Expended by the Taxpayer in Carrying on the Activity.
Section 1.183-2(b)(3), Income Tax Regs., provides: The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount *75 of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. There is no question that the entire family devoted enormous personal time and effort to caring for and developing their horses. The children gave up school activities, one a part-time job, in order to prepare for and attend these shows eight months of the year. They also worked before and after school each day taking care of the horses and warking in the alfalfa field. Mrs. Doyle considered her activities with the horses a full-time job. We believe Mrs. Doyle's testimony that she did not enjoy showing the horses, the long hours or traveling to shows every weekend with poor accommodations. The degree of hard work required overshadowed any pleasure or recreation which petitioners may have derived from the activity. We find that her efforts indicated a profit objective. Factor (4): Expectation that Assets Used in Activity May Appreciate in Value.
Petitioners intended to make a profit by developing horses to meet AQHA standards. The way to do this was by showing them, earning points which increased their *76 value and then breeding them to sell their foals. Petitioners had, in fact, produced valuable horses by 1978. There is no doubt that their effort to win points and meet AQHA standards was caused by the expectation that this would greatly increase the value of their horses. Factor (5): The Success of Taxpayer in Carrying on Other Similar or Dissimilar Activities.
Petitioners have not engaged in any similar horse ranching activities in the past. Accordingly, this factor does not weigh either for or against petitioners' position. Factor (6): The Taxpayer's History of Income or Losses with Respect to the Activity.
Section 1.183-2(b)(6), Income Tax Regs., provides in pertinent part: A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because *77 of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. * * * Respondent points to petitioners' losses during the three taxable years--$13,478, $18,636, and $11,169.56, respectively--as indicative that petitioners were not engaged in their horse-breeding activities for profit. We noted in Engdahl v. Commissioner,72 T.C. 659, 669 (1979), "a series of losses during the initial stage of an activity does not necessarily indicate that the activity was not engaged in for profit." We also recognized that the start-up phase for horse-breeding operations is five to ten years. Engdahl v. Commissioner,supra at 669. Petitioners' losses for the years in issue fall within this start-up period. [8] By 1978, petitioners had developed one AQHA champion which had produced a foal. The business should have turned around at this point, but one mare, close to champion status, died in 1978 and the AQHA champion died of colic the *78 following year. Respondent also points to the lack of success by some of their trainers. In Engdahl, at 609, we considered this a factor contributing to the taxpayer's losses. In the instant case, petitioners did consult professional trainers of national prominence when by 1976 they had not received any show points. It was at that point that they purchased the three, more expensive, AQHA-registered mares. Factor (7): Amount of Occasional Profits, if any, Which Are Earned.
Section 1.183-2(b)(7), Income Tax Regs., provides in relevant part af follows: The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. * * * This factor provides *79 guidelines for interpreting the presence or absence of profit. We have carefully analyzed petitioners' operating expenses for 1974 through 1979 and find that the pattern that emerges corroborates Mrs. Doyle's testimony. During the taxable years in issue, petitioners carried on this activity with the objective of making a profit. Petitioners wanted a quality investment but lacked the cash resources to buy it.They believed, however, that through the difficult task of doing most of the work themselves, they could develop a quality asset. While certain of their expenses remained relatively constant, their increased proficiency reduced feed costs and training fees. They did produce a more valuable asset, as evidenced by the $15,000 insurance proceeds from the death of their best horse. Petitioners attribute their lack of profitability to a combination of adverse factors. Petitioners, despite their efforts from 1972 to 1975, were unable to win any AQHA points. In 1976, they acquired higher quality mares and breeding rights in accordance with their plans to raise and sell foals. It was not until 1978 that the first horse attained AQHA champion status and a second mare was on its *80 way. Although petitioners estimated a three- to four-year cost recovery period for each champion developed, by 1978 their had been only one live birth. Just when it seemed that business would turn around, two of their best mares died. In addition, petitioners were sued on an unrelated legal matter. A settlement of $145,000 consumed their entire savings and put them heavily into debt. In the fact of such adversity, petitioners decided that they could not begin their horse activities again. Instead, they began another unrelated business in which they both worked twelve hours a day. In light of these circumstances we cannot accord great weight to the absence of profits during the taxable years in question. The pattern of expenses shows a gradually evolving business which, while it never got off the ground, is consistent with a profit objective. Factor (8): Financial Status of the Taxpayer.
Section 1.183-2(b)(8), Income Tax Regs., provides: The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly *81 if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. Respondent contends that petitioners' "high tax bracket" indicates that the horse breeding and showing activity was not engaged in for profit since the losses generated by the activity gave petitioners substantial tax benefits. In Engdahl, we did not construe the language in section 1.183-2(b)(8), Income Tax Regs., (quoted above) as an additional reason to deny a deduction. Instead, we said that "the concurrent existence of other income poses the question, rather than answers it." Engdahl v. Commissioner,supra at 670. It is a simple economic fact that "[a]s long as tax rates are less than 100 percent, there is no 'benefit' in losing money." We said further in Engdahl, "[the] essential question remains as to whether there was a genuine hope of economic profit." It is unlikely that, without a profit objective, petitioners would have embarked on their horse activity which cost thousands of dollars and demanded extreme personal physical labor. Factor (9): *82 Elements of Personal Pleasure or Recreation.
Section 1.183-2(b)(9), Income Tax Regs., provides in pertinent part as follows: The presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. * * * An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph. Respondent's argument as to this final factor is that petitioners received personal and recreational benefits from their horse activities *83 and, therefore, it is not engaged in for profit. The regulations make clear, however, that the derivation of personal pleasure from the activity by the taxpayer is insufficient to cause its classification as "not engaged in for profit." In actuality, the facts belie respondent's contention. Petitioners and their children made enormous efforts to make this business profitable. They did virtually all the hard work themselves in the interest of saving money. They maintained the horses, mucked out the stalls, drove to the shows, cultivated the alfalfa field, and dug their own well. Activities of this nature are difficult to call pleasurable. After viewing the record as a whole, we conclude that petitioners pursued their horse activities with an actual and honest profit objective. The losses incurred in the activity during the taxable years in issue are fully deductible. Decision will be entered under Rule 155.
Footnotes
1. The Commissioner also determined additions to tax for the taxable years 1976 and 1977 under sec. 6653(b), I.R.C. 1954, and additions to tax for the taxable year 1978 under sec. 6653(a), I.R.C. 1954↩, to which petitioners did not assign error in their petition.
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. The gestation period for horses is eleven months.↩
4. Petitioners were sued on an unrelated matter. A settlement of $145,000 consumed their entire savings and put them heavily into debt. This contributed greatly to their decision to discontinue their horse operations.↩
*. This profit reflects the receipt of $15,000 insurance proceeds on the death of their top mare.↩
5. See S. Rept. 91-552, accompanying H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 104 (1969). ↩
6. Sec. 183(b)(1) allows deductions related to the activity which are allowable regardless of whether the activity is engaged in for profit, such as interest and taxes. In addition, sec. 183(b)(2) authorizes a deduction for other expenses related to the activity to the extent that the gross income derived from the activity exceeds the deductions which are allowable irrespective of an objective to realize a profit. In the instant case, the Commissioner disallowed petitioners' 1976 farm deductions in their entirety. Petitioners, however, reported $750 of farm income on their schedule F which they netted against their farm deductions. This is permitted under sec. 183(b)(2) even when there is no profit objective.↩
7. See Benz v. Commissioner,63 T.C. 375, 382-383↩ (1974).
8. See Farris v. Commissioner,T.C. Memo, 1972-165; Foster v. Commissioner,T.C. Memo. 1973-14↩.