H. CONNELY PLUNKETT AND IRIS PLUNKETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Plunkett v. Commissioner
Docket No. 13819-81.
United States Tax Court
T.C. Memo 1984-170; 1984 Tax Ct. Memo LEXIS 507; 47 T.C.M. (CCH) 1439; T.C.M. (RIA) 84170; April 3, 1984. Lauch M. Magruder, Jr., for the petitioners. Jillena Warner and Katherine S. Weed, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for taxable years 1977 and 1978 in the amounts of $7,827.83 and $1,409, respectively. After concessions by the parties, the only issue for decision is whether petitioners' mud-racing and truck-pulling activities constitute an "activity * * * not engaged in for profit" within the meaning of section 183(a). [1]
*509 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioners are married and filed joint Federal income tax returns for 1977 and 1978 with the Internal Revenue Service in Atlanta, Georgia. Petitioners were legal residents of Madison, Mississippi, when they filed their petition. Petitioner H. Connely Plunkett is an architectural engineer and a partner of an architectual firm located in Jackson, Mississippi. [2] He also is in the business of building homes. Extensive income generated by these businesses partially paid for petitioner's mud-racing and truck-pulling activities. Mud racing is a relatively new entrant to the American sporting scene. It generally involves speed competition amongst four-wheel drive vehicles on a circular track which has been intentionally transformed into a mudhole. A mud-racing track *510 is usually constructed as follows: a round asphalt speedway with a pond in its center is selected; a dirt track is constructed within the inner perimeter of the asphalt speedway; earthen berms are built along the inner and outer edges of the dirt track; and finally, large amounts of water are drained from the pond and pumped onto the dirt track in order to create water depths between one and three feet depending upon the location within the newly formed mudhole. Apparently, deeper water creates more exciting starts while smaller amounts of water produce a thicker and more viscid mud, which in turn, provides for slow-motion finishes. Mud-racing drivers compete in four different classes: (1) vehicles with six-cylinder engines; (2) "V-8 stock," i.e., eight-cylinder vehicles whose engines and remaining components are substantially unchanged from the factory; (3) "street-modified," i.e., eight-cylinder vehicles whose engines are modified for racing but the remainder is substantially unchanged; and (4) "super-modified" which encompasses generally unrestricted multi-cylinder vehicles. All classes of these mud-racing vehicles use gasoline as fuel; nitromethane and other exotic fuels are *511 specifically banned. Mud-racing participants may compete in as many different classes as they have qualifying vehicles. Most mud-racing contests usually charge each class entrant a registration fee which is typically $35. Mud-racing entrants usually compete two at a time, against each other and the clock. Elimination heats select the two fastest vehicles in each class. A final heat determines the class winner. Depending upon the total purse of the mud race, the winner of the "super-modified" class would receive a cash award of approximately $500; while second, third and fourth place finishers would earn $400, $300 and $200, respectively. Smaller cash prizes are generally awarded in the less sophisticated classes. A mud race usually lasts a single day. Most mud races are locally sponsored and held during the spring, summer and fall months in Mississippi, Alabama, Texas, Louisiana, Tennessee, Arkansas and Florida. Truck pulling is an entirely different sporting event. Although it also includes similar classes of four-wheel drive vehicles which have been modified for pulling, the participants compete by attempting to tow a large weighted sled along a straight dirt runway. *512 The sled normally contains 3,500 pounds of weights. At the beginning of each pulling attempt, the weights are positioned in the rear of the sled. As a competitor pulls the sled forward, the weights are mechanically shifted towards the front of the sled which increases the total pulling resistance. At some point, the resistance usually exceeds the vehicle's pulling power; hence, the sled does not advance any further. [3] A competitor's success is determined by measuring the distance that the sled has been pulled: the further, the better. A participant's finish is determined by the distance traveled in a single attempt; there are no elimination beats. As in mud racing, each truck-pulling participant competes in as many different classes as he has qualifying vehicles. Unlike mud racing, however, participation in a truck-pulling contest is by invitation only and there usually is no registration fee. Most truck-pulling events involve several days of competition. Cash awards are distributed to the winners and other high finishers at *513 the end of each day of competition. Depending upon the size of the total purse, a truck-pulling competitor can win up to $1,000 per day in the "super-modified" class and possibly even $2,000 over a weekend. Truck-pulling contests are generally held throughout the year although the winter circuit, which is promoted nationally by Truck-O-Rama, Agri-Shows and TNT, usually has significantly more prize money. In many parts of the country, especially in agricultural areas, truck-pulling competition is combined with tractor-pulling events. Petitioner has worked on automobiles since he was 12 years old. He has also participated in drag and round-track car racing although he discontinued such activities due to the excessive cost and risk. Petitioner began to mud race in 1975 without ever having been a spector at such an event. Petitioner competed in only one mud race during the 1975 season yet won $100 on his debut. During the 1976, 1977 and 1978 mud-racing seasons, petitioner entered 10, 20 and 26 races, respectively. Petitioner generally competed in the "super-modified" class while mud racing. During 1977, petitioner became increasingly interested in truck pulling. He eventually *514 converted a truck which had been substantially destroyed during a mud race into a truck-pulling vehicle and began to compete in this sport. He subsequently converted another of his mud racers into a truck-pulling vehicle. He entered one truck-pulling contest in 1977; approximately three truck pulls in 1978; and about a dozen contests in 1979 and 1980. Petitioner competed in the "V-8 stock," "street-modified" and "super-modified" classes of truck pulls. At some point during petitioner's truck-pulling endeavors, he was ranked 35th in the nation by Truck-O-Rama, a national truck-pulling promoter. Petitioner's interest in mud racing waned as his truck-pulling activities increased. This was largely the result of his realization that he had an increased likelihood of winning more money in truck pulling. Truck-pulling contests generally have larger purses and this sport is increasing in popularity. Many truck pulls draw over 15,000 paying spectators. Petitioner drove all of the vehicles he entered in mud races and truck pulls. He never had any formal training for these activities; he acquired expertise through participation. Petitioner did not employ any crew or experienced personnel *515 to assist him in either competition format. Petitioner performed most of the maintenance work on his vehicles although he did employ a machinist to assist him in preparing and repairing various engine components. His 11-year-old son occasionally assisted him. Petitioner devoted approximately 500 hours per year to his mud-racing and truck-pulling activities during the years in issue. Petitioner enjoyed mud racing and truck pulling. When petitioner began to mud race, he anticipated that it would take him three years to recover his initial outlays. In 1977 and 1978, petitioner had three vehicles which he used in his mud-racing and truck-pulling activities: Blazer I, which was purchased on June 30, 1976 for $8,400; Blazer II, which was also purchased on June 30, 1976 for $5,525; and a truck purchased on July 7, 1977 for $2,463. Petitioner also briefly used another truck which was purchased on June 30, 1976, for $2,200 but was subsequently wrecked and junked in April, 1977. On June 30, 1977, petitioner made $1,100 of improvements to Blazer II. One year later, petitioner made $2,500 of additional improvements to this vehicle. Throughout his participation, petitioner replaced *516 numerous vehicle parts which were destroyed during competition. Petitioner did not maintain a formal set of records with respect to his mud-racing or truck-pulling activities. He maintained a record of his winnings on a calendar yet did not produce it when asked by an Internal Revenue Service agent for all of his records pertaining to his racing activities. Expenses generated by his mid-racing and truck-pulling endeavors were paid out of petitioner's personal bank account in a fashion similar to his construction business. On petitioners' joint Federal income tax returns for 1976, 1977 and 1979, the following income, deductions and losses relating to mud racing and truck pulling were reported: Year
Income
Deductions
Loss
1976
$500
$5,675
($ 5,175)
1977
814
16,626
( 15,812)
1978
600
24,938
( 24,338)
The above deductions arose from the following items: 1976
Depreciation
$ 3,021
Repairs
2,454
Entry Fees
200
Total
$ 5,675
1977
Depreciation
$ 6,146
Repairs
10,480
Total
$16,626
1978
Depreciation
$ 6,914
Repairs
17,764
Entry Fees
260
Total
$24,938
Petitioner's expenses were greatest during *517 1978 as he became increasingly interested in truck pulling and also built a trailer and tow truck. Petitioner did not claim all of his expenses relating to his mud-racing and truck-pulling activities on his Federal income tax returns. He did not claim any transportation, racing fuel or lodging costs, nor did he expense several tools he purchased to work on his vehicles. He also did not claim any storage expenses with respect to a barn he converted into a garage in order to house his mud-racing and truck-pulling vehicles. The Commissioner determined that petitioner's racing endeavors during the taxable years 1977 and 1978 were an activity not engaged in for profit within the purview of section 183 and therefore disallowed claimed racing losses of $15,812 and $24,338, respectively. OPINION Section 183(a) provides that, except as otherwise permitted in that section, individual taxpayers will not be allowed deductions which are attributable to activities that are "not engaged in for profit." Section 183(b)(1) provides that deductions which would be allowable without regard to whether *518 such activity is engaged in for profit shall be allowed. Section 183(b)(2) further provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. The standard for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162, or whether an individual is engaged in activities for the production or collection of income or for the management, conservation or maintenance of property held for the production of income so that his expenses are deductible under section 212, *519 is: did the individual engage in the activity "with the actual and honest objective of making a profit"? Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). Although a taxpayer's expectation of profit need not be reasonable, the facts and circumstances must indicate that the taxpayer had the requisite profit objective. Dreicer v. Commissioner,supra at 645. The requisite good-faith objective of making a profit, albeit an unreasonable expectation, is exemplified in section 1.183-2(a), Income Tax Regs., as follows: Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures *520 is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent. The question of whether petitioner's mud-racing and truck-pulling activities fall within the purview of section 183(a) is one of fact which must be resolved on the basis of all of the facts and circumstances and not just one factor. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). Petitioners have the burden of proving that they had the requisite profit objective. Allen v. Commissioner,supra at 34; Benz v. Commissioner,63 T.C. 375, 382 (1974); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors, derived principally *521 from caselaw, which "should normally be taken into account" in determining whether an activity is engaged in for profit. Benz v. Commissioner,supra at 383. The factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Upon examination of petitioner's mud-racing activities in light of the nine objective criteria set forth in the regulations, we hold that such endeavors constitute an activity "not engaged in for profit" within the scope of section 183(a). Although petitioner was experienced in mechanics and racing and had been "playing with automobiles" since he was 12, he had no prior experience *522 in four-wheel drive vehicle competition prior to the start of his mud-racing activities. The racing of four-wheel drive vehicles through specially built mudholes also involves a great deal of recreational characteristics. Further, the profit potential from mud racing is generally low. Each participant must successfully complete numerous heats to even be eligible for the cash awards, thus significantly increasing the likelihood of elimination or damage to the mud racer. Finally, even assuming petitioner had won every mud race he entered (which is totally unsupported by petitioner's actual track record), his total winnings would have been significantly less than his attendant expenses; therefore, petitioner did not have an actual and honest objective of making a profit from his mud-racing activities during the years in issue. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra.Accordingly, all of petitioner's mud-racing expenses during the years in issue shall be governed by the provisions of section 183. Upon review of petitioner's truck-pulling activities, however, we hold that such endeavors were engaged in for *523 profit during petitioner's taxable year 1978. [4] Petitioner carried on his truck-pulling activities in a workmanlike fashion, guided by the additional racing experience he gained during his mud-racing competition. Through his diligence and devotion of large amounts of time and effort, petitioner was ultimately ranked 35th in the nation by Truck-O-Rama, a national truck-pulling promoter. Petitioner also converted some of his mud-racing vehicles into truck-pulling devices, thus limiting his recreational use of such vehicles in future mud races, with no assurance that he would even be able to compete since participation in truck pulls is by invitation only. Finally, petitioner expanded into this new activity only after realizing that it had a greater profit potential than mud racing.Truck pulling differs from mud racing in several significant respects concerning its profitability potential. Truck-pulling contests generally have larger total purses and class oprizes and this pasttime is increasing in popularity. The truck-pulling circuit is also national in scope while mud racing is generally confined to the southeastern portions of the country. A truck-pulling participant's chances *524 of elimination or damage to his vehicle is also significantly less than a mud racer's because a truck-pulling competitor's finish and eligibility for cash awards is determined by a single pulling attempt while mud racing involves numerous elimination heats. While some of the objective criteria listed in the regulations weigh against the petitioner, we do not consider them significant enough to offset the criteria which weigh in his favor. Although petitioner did not maintain a formal set of records concerning his truck-pulling endeavors, he generally conducted this activity in a fashion similar to his construction business which was also engaged in for profit. The fact that petitioner did not display his calendar on which he originally marked his winnings to the examining agent is also not fatal; there is no evidence that petitioner did not report all of the income generated by his racing. Further, the fact that petitioner's truck-pulling activities were *525 not immediately profitable does not alter our opinion that petitioner had a bona fide objective of making a profit when he began to compete in truck-pulling contests. The regulations specifically acknowledge that losses can be incurred during the formative years of profit-oriented activities. Sec. 1.183-2(b)(6), Income Tax Regs. Any omitted transportation, gasoline and tool expenses were inconsequential and would not significantly affect petitioner's truck-pulling profitability. Finally, the fact that truck-pulling competition and the related preparatory activities involve some elements of recreation and pleasure for petitioner, who liked to work on cars, is not determinative. Respondent's regulations also provide that: An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity *526 is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph. [Sec. 1.183-2(b)(9), Income Tax Regs.] The record before us does not differentiate between petitioner's mud-racing and truck-pulling expenses for the taxable year 1978. Given our holding that petitioner's truck-pulling activities during this year were engaged in for profit, some allocation is appropriate. During 1978, petitioner participated in 26 mud races and three truck pulls; therefore, our best estimate of the proper amount of expenses incurred during this year with respect to petitioner's truck-pulling activities is the proportion of the number of truck pulls entered to total number of truck pulls and mud races engaged in; i.e., 3/29. Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930). Accordingly, of the $24,938 of deductions claimed on petitioner's 1978 Federal income tax return with respect to both mud racing and truck pulling, $2,579.79 of such deductions are attributable to an activity engaged in for profit while the remainder of the deductions claimed for the years in issue are governed by the provisions of *527 section 183. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner Iris Plunkett is a party herein solely as the result of her filing joint Federal income tax returns with her husband for the years in issue. For convenience, therefore, we will hereafter refer to H. Connely Plunkett as petitioner.↩
3. The lone exception was a vehicle powered by four engines which was not stopped by the sled, even at the point of maximum pulling resistance.↩
4. During taxable year 1977, petitioner only entered one truck pull which was his debut in this new activity. Such limited activity, especially during an initial year, does not demonstrate the requisite profit objective.↩