FRANCIS X. AND IRENE BENZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 416-72, 2453-72.    Filed December 17, 1974.

*J. Ernest Brophy,* for the petitioners.
*George W. Connelly, Jr.,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable years 1968, 1969, and 1970 in the respective amounts of $4,865.20, $1,728.15, and $2,054.55.

Certain concessions having been made by petitioners, the only issue remaining for decision is whether losses sustained in raising,

training, and breeding dogs are deductible as losses from a venture carried on for profit.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Francis X. and Irene Benz, husband and wife, filed joint Federal income tax returns for the calendar years 1968, 1969, and 1970 with the Internal Revenue Service Center in Andover, Mass. At the time of the filing of the petition herein they resided in Kenmore, N.Y. Irene is a party only because she filed joint returns with her husband, and hereinafter Francis will be referred to as petitioner.

Petitioner was educated in the fields of metallurgical engineering and drafting.

He was president, treasurer, and sole shareholder of Atmosphere Heat Treat Corp. (Atmosphere) at all relevant times. Atmosphere was originally founded by petitioner as a sole proprietorship in 1955. Within 2 years of its establishment the business was profitable. It was incorporated in 1960.

During the years in question petitioner devoted at least 48 hours per week to Atmosphere. He directly supervised accounting and sales and he actively participated in design and construction of equipment.

Irene was employed as a bookkeeper by Atmosphere. Her duties included general "fill in" work and preparation of the corporation's "confidential payrolls."

During the years in question petitioner and Irene reported the following compensation on their income tax returns:

| | |
|---|---|
| 1968 | $21,970.17 |
| 1969 | 35,345.00 |
| 1970 | 40,397.00 |

Petitioner owned the land and buildings occupied by Atmosphere. During the years 1968, 1969, and 1970 the leases executed by petitioner and Atmosphere required that Atmosphere pay rental of $14,000, $24,000, and $31,200, respectively. The corporation also paid taxes, insurance, and other expenses relating to the property.

In early 1966 Atmosphere purchased stock of the Isle Marine Restaurant, Inc., a supper club which petitioner felt had potential

for profitable operations. After the club suffered losses in 1966 and 1967 Atmosphere sold the stock.

In 1968 petitioner, together with two other men, incorporated BSB Products Corp. (BSB). BSB was not profitable so petitioner sold his BSB stock to Atmosphere in 1970.

Petitioner purchased his first German shorthaired pointer (hereafter pointer), Sandgaard's Arrak (hereafter Arrak), as a hunting companion in either 1964 or 1965. Prior to that time petitioner had only owned one other dog, an Irish Setter. Arrak, a male, was 6 to 8 months old at the time of the purchase. At the time that petitioner purchased Arrak he was not in the business of raising and training pointers.

Petitioner entered Arrak in several field trials during 1965. Field trials are contests where dogs are tested for their hunting and pointing ability. The pointer is required to come up, point the bird, kick the bird out, then after the bird is shot the dog retrieves it upon receiving a signal to do so. Field trials are different from dog shows because the two types of contests stress different qualities. Generally, a dog is not shown until it is over 1 year old.

During 1965 petitioner spent $380 to board and train Arrak and he spent $30 for entrance fees for field trials. Petitioner deducted those expenses on his Federal income tax return as business losses.

Petitioner purchased another pointer named Blind Spot (hereafter Spot) in June 1966. At that time Spot was 3 or 4 months old. Petitioner's purpose in purchasing Spot was to show her and use her to establish his own line of pointers. Prior to the time that he decided to establish his own line, he was told by traders and owners that he met at field trials that raising pointers could be profitable. Aside from what he was told, he did not investigate the matter further.

Before purchasing Spot, petitioner consulted Wilbert Ferchen (hereafter Ferchen), a professional trainer who recommended that petitioner purchase her. Ferchen and Robert Walgate (Walgate) handled the pointers in some field trials and shows and petitioner handled the dogs in others.

Petitioner's costs with respect to the dogs for 1966 were:

| | |
|---|---|
| Trial fees | $335.50 |
| Boarding and training | 693.60 |

The total, $1,029.10, was deducted on petitioner's tax return as a business loss. Subsequently, that deduction, along with others, was questioned by respondent and petitioner agreed to an adjustment.

Petitioner enjoyed the outdoors from the time he was a child. Since he was 20, he has liked hunting. He did some hunting with Arrak and Spot, but during the years in question he hunted very little, if at all, because there were so many other hunters. He did maintain his membership in a pheasant preserve and hunting club called Webers, where he "trained" his dogs.

During 1967 petitioner bought three pointers and he sold one, Arrak. He received $250 on the sale thus realizing a gain of $170. The three dogs purchased were Ef-Fex's Johanesburg Beau (hereafter Beau), a male; Ef-Fex's Johanesburg Tuffy (hereafter Tuffy), another male; and Ef-Fex Katrinka Oranien (hereafter Katrinka), a female.[1] Petitioner purchased Katrinka because he thought her bloodlines would compliment those of Spot.[2] On his 1967 income tax return petitioner deducted $1,556.50 as a loss from his dogs.

It was not petitioner's intention to sell puppies. Instead he was interested in developing champion studs. The owner of a male which is field champion is paid $150 for the dog's services and the owner of a show champion is paid a like amount. Petitioner thought that some of the better stud dogs had been used two or three hundred times during their lifetimes, but he admitted that this figure was not a matter of record. A pointer is generally not used for stud purposes until it is 2 years of age, and it may be used until it is 12.

For a pointer to be a field champion it must win 10 points in field trials; to be a show champion it must win 15 points in dog shows. The American Kennel Club keeps a record of the points won. A stud dog which has become a champion must continue to be shown after achieving that status so its availability can be advertised. Petitioner believed that "it could take possibly as long as 10, 12 years" to establish a good stud.

---

[1] Petitioner's Federal income tax return for 1966 lists Arrak and Spot as the only pointers owned. His 1967 return lists five dogs; presumably Beau, Tuffy, and Katrinka were acquired in 1967. However, the stipulation lists Beau as being acquired in 1968 and Tuffy is not listed at all as being one of petitioner's dogs.

[2] We have noted that both of the aforementioned dogs are females.

The "Ef-Fex" which was included in some of the dogs' names represented petitioner's first two initials and was the name that he wanted to establish as his kennel's name. Kennels specializing in breeding incorporate the name of the kennel in the names of the dogs born at the kennel. A registered kennel name is established by applying to the American Kennel Club. If the name requested has not already been registered, it is granted to the applicant. Petitioner did not register the "Ef-Fex" name so he did not have a registered kennel. Several of his dogs were registered individually, however.

Respondent audited petitioner's return for 1967 and questioned several items including the loss of $1,556.50. In October 1968 petitioner agreed to the disallowance of the $1,556.50 loss.

Petitioner owned seven pointers during 1968: Spot; Beau; Tuffy; Katrinka; Ef-Fex's Red Baron (hereafter Baron), a male; Ef-Fex's Johanesburg Ringo (hereafter Ringo), another male; Ef-Fex's Hilde Babe (hereafter Hilde), a female.[3] During that year Tuffy was disposed of, however. Hilde and Baron were offspring of Spot. Four other puppies from the same litter were sold for a total of $450. The seventh puppy of the litter was exchanged in a "puppy deal" for another puppy, Ef-Fex's Adel, which petitioner received in 1971.

Petitioner boarded all the dogs except Katrinka during 1968. Petitioner's expenses for the dogs in 1968 were:

Board, handling, and training_____ $2,183.65
Other expenses_____ 1,486.50

Petitioner deducted the total of $3,670.15 on his Federal income tax return for 1968 while he failed to report the $450 of gain.

During 1968 three of petitioner's pointers were entered in field trials and shows. They placed as follows:

| Dog | Entries | 1st | Field trials 2nd | 3rd | 4th | – | Entries | 1st | Shows 2nd | 3rd | 4th | – |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Katrinka | 1 | 1 | 0 | 0 | 0 | 0 | 20 | 2 | 1 | 4 | 4 | 9 |
| Beau | 1 | 1 | 0 | 0 | 0 | 0 | 0 | | | | | |
| Ringo | 0 | | | | | | 18 | 7 | 3 | 5 | 0 | 3 |

Petitioner owned six dogs during 1969. All of them except Katrinka were boarded by Ferchen through the end of May 1969. After June 1, 1969, Spot and Beau were boarded and trained by

---

[3] Petitioner's return for 1968 only lists four of these dogs.

Thomas Getler (hereafter Getler). The costs with respect to the dogs for 1969 were as follows:

| Board and training | $2,087.95 | Field trial entry fees | $551.00 |
|---|---|---|---|
| Handler's fees | 371.00 | Transportation | 116.00 |
| Dog show entry fees | 111.00 | | |

The results of the field trial and show entries of petitioner's dogs during 1969 are as follows:

| Dog | Field trials | | | | | | Shows | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Entries | 1st | 2nd | 3rd | 4th | – | Entries | 1st | 2nd | 3rd | 4th | – |
| Beau | 6 | 0 | 5 | 0 | 1 | 0 | 0 | | | | | |
| Red Baron | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 0 | 0 |
| Hilde | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| Katrinka | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Ringo | 0 | | | | | | 10 | 0 | 2 | 2 | 5 | 1 |

In January 1970 petitioner withdrew his remaining three dogs from Ferchen's supervision and moved them to a kennel at the Atmosphere plant. During the period that Ferchen cared for the animals petitioner visited them once or twice a week and the visits were always in the evening. Petitioner never visited Getler's kennels which were in New Jersey.

Petitioner continued to own the same dogs during 1970. He sold Ringo on approval during hunting season of that year, but the dog was returned and the buyer's check was refunded.[4] During 1970 Getler handled Spot and Beau in competition and petitioner handled the other dogs. While petitioner and Getler occasionally showed petitioner's dogs at the same contests, petitioner did not attend any contest for the sole reason of observing Spot or Beau. During 1970 petitioner attended approximately 20 contests which was the same number he had attended in 1968 and 1969. He was a participant in more of the contests in 1970.

The expenses relating to the dogs for 1970 were as follows:

| Board and training | $2,092 | Transportation expense | $394 |
|---|---|---|---|
| Handler's fees | 369 | Medical expense | 88 |
| Dog show entry fees | 106 | | |
| Field trial entry fees | 999 | | 4,048 |

The results of the field trials and shows for 1970 are as follows:

| Dog | Field trials | | | | | | Shows | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Entries | 1st | 2nd | 3rd | 4th | – | Entries | 1st | 2nd | 3rd | 4th | – |
| Spot | 5 | 1 | 2 | 2 | 0 | 0 | 0 | | | | | |
| Katrinka | 1 | 0 | 1 | 0 | 0 | 0 | 3 | 1 | 0 | 1 | 1 | 0 |
| Beau | 0 | | | | | | 0 | | | | | |
| Hilde | 4 | 1 | 2 | 0 | 1 | 0 | 7 | 0 | 1 | 2 | 0 | 4 |
| Red Baron | 0 | | | | | | 3 | 1 | 2 | 0 | 0 | 0 |

---

[4] The record is not entirely clear whether Ringo was returned but we have proceeded on the assumption that he was.

Cash prizes were not awarded to winners of trial competition before 1970; until then only trophies and ribbons were awarded. Winners at dog shows might receive cash prizes of as much as $500 but generally the first place prize did not exceed $100.

During 1971 petitioner acquired three new dogs and sold or traded two of the pointers that he had previously owned. Beau was traded for Eastwinds TK Rebel (hereafter Rebel) in May. Baron was sold for $150 in February. Ef-Fex's Franz Oden was acquired in July and Ef-Fex's Adel was acquired in August.

Petitioner's expenses for 1971 were as follows:

| | | | |
|---|---|---|---|
| Dues and subscriptions | $23 | Transportation expense | $284 |
| Boarding and training | 1,808 | Medical expenses | 128 |
| Handler's fees | 300 | Licenses and registration | 14 |
| Dog show entry fees | 130 | | |
| Field trial entry fees | 832 | | 3,519 |

The results of the field and show entries for petitioner's dogs in 1971 were the following:

| Dog | Entries | Field trials 1st | 2nd | 3rd | 4th | – | Entries | Shows 1st | 2nd | 3rd | 4th | – |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hilde | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| Rebel | 0 | | | | | | 13 | 4 | 3 | 1 | 1 | 4 |
| Katrinka | 1 | 0 | 1 | 0 | 0 | 0 | 0 | | | | | |
| Spot | 4 | 1 | 2 | 1 | 0 | 0 | 0 | | | | | |

Petitioner owned seven[5] dogs and five puppies during 1972. The five puppies were Spot's offspring. Of the litter, petitioner retained two of the puppies: Ef-Fex's Mistish and Ef-Fex's The Baron. The other three puppies were sold for a total of $375. Petitioner also sold Franz and Adel for $125 each.

In addition to the $625 which petitioner received on the above-mentioned sales, he also received cash prizes of $27 and handling fees of $180.

His expenses were as follows:

| | | | |
|---|---|---|---|
| Handling fees (paid to Getler) | $214.00 | Medical | $741.24 |
| Board and training (paid to Getler) | 806.25 | Travel | 250.57 |
| Field trial fees | 1,035.00 | Dues | 77.00 |
| Show entry fees | 125.00 | Licenses | 11.00 |
| Food and supplies | 283.63 | Birds for training | 375.00 |
| | | | 3,918.70 |

---

[5] See fn. 4 *supra.*

Respondent disallowed the claimed expenses relating to the dogs for the years 1968, 1969, and 1970. It is those expenses which are now before us for consideration. ·

OPINION

The only issue presented is whether petitioner is entitled to deduct the losses he incurred in years 1968, 1969, and 1970 as a result of the activities relating to his dogs. For the years 1968 and 1969 it must be established, by petitioner, that his endeavor was entered into or conducted with the intention of making a profit.[6] *Margit Sigray Bessenyey,* 45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967). Whether petitioner proves such intention is a question of fact which must be determined upon the record. *Theodore Sabelis,* 37 T.C. 1058 (1962). With respect to 1970 we note that section 183, which was enacted as a part of the Tax Reform Act of 1969 and is effective for taxable years beginning after December 31, 1969, is applicable.[7] This section pertains to "Activities

---

[6] The following sections would be pertinent:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
* * *

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; * * *

[7] For taxable year 1970 the aforementioned sections and the following section are applicable:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only

Not Engaged In For Profit." It was intended to introduce a more objective standard in cases of this nature. See S. Rept. No. 91-552, to accompany H.R. 13270 (Pub.L. 91-172), 91st Cong., 1st Sess., p. 104 (1969). The regulations promulgated under section 183 are generally distilled from prior case law,[8] however, and the outcome of many cases will be the same whether they involve years beginning prior to or subsequent to December 31, 1969.[9] In our view the instant matter is such a case.

The test to be applied in a case of this nature is not one of reasonable intention or expectation but bona fide intention and expectation. S.Rept. No. 91-552, *supra* at p. 104. *Margit Sigray Bessenyey, supra.* If the taxpayer has a good-faith expectation of profit from a particular venture, irrespective of whether or not others might view that expectation as reasonable, his venture is a trade or business. *Mercer v. Commissioner,* 376 F. 2d 708 (C.A. 9,

---

to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

(d) PRESUMPTION.—If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary or his delegate establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.

(e) SPECIAL RULE.—

(1) IN GENERAL.—A determination as to whether the presumption provided by subsection (d) applies with respect to any activity shall, if the taxpayer so elects, not be made before the close of the fourth taxable year (sixth taxable year, in the case of an activity described in the last sentence of such subsection) following the taxable year in which the taxpayer first engages in the activity. For purposes of the preceding sentence, a taxpayer shall be treated as not having engaged in an activity during any taxable year beginning before January 1, 1970.

(2) INITIAL PERIOD.—If the taxpayer makes an election under paragraph (1), the presumption provided by subsection (d) shall apply to each taxable year in the 5-taxable year (or 7-taxable year) period beginning with the taxable year in which the taxpayer first engages in the activity, if the gross income derived from the activity for 2 or more of the taxable years in such period exceeds the deductions attributable to the activity (determined without regard to whether or not the activity is engaged in for profit).

(3) ELECTION.—An election under paragraph (1) shall be made at such time and manner, and subject to such terms and conditions, as the Secretary or his delegate may prescribe.

[8] See Lee, "Section 183 and Beyond," 29 Tax L. Rev. 395 (1974).

[9] See Rhodes, "Hobby Losses—A New Challenge," 56 A.B.A. J. 895 (1970).

1967). In applying that test, however, it is relevant to consider a taxpayer's prior experience and actions.

Petitioner was a businessman of considerable experience. He was president and treasurer of his own company and he was active in several other businesses in which he had held interests. As chief operating officer of his own company he had disposed of an unprofitable subsidiary, a dinner club, when it proved to be unprofitable for a period of 2 years. He also sold the stock of BSB to Atmosphere when BSB proved to be unprofitable.

For the 3 years prior to the years in issue petitioner had incurred expenses of $2,995.10 in connection with his dogs. He believed, furthermore, that it would take 10 to 12 years to establish a champion stud. Petitioner was fully aware from the outset, therefore, that he would suffer losses over a considerable time and he did, in fact, incur expenses of over $20,500 in comparison to reported income of $1,200 during the years 1965 to 1973.[10]

While losses often occur during the formative years of a business and particularly when the venture involves animals, "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." *Margit Sigray Bessenyey, supra* at 274. Petitioner contends that he thought he could recoup all his losses once he had developed a champion stud. He asserted, at trial, that the activity in question had reached a turning point and would soon begin making a profit because Rebel was close to being a finished champion.

We are not convinced that petitioner ever expected to realize sufficient net earnings from stud fees to recoup the losses which we believe he anticipated during the initial years. Petitioner chose to make his argument in terms of the earnings which might be realized from Rebel's services. He assumed that Rebel might be used two or three hundred times over a 10-year period for fees of $150. Assuming that Rebel was used 25 times a year, petitioner might average $3,750. Yet petitioner's expenses for

---

[10] We need not decide whether the presumption contained in sec. 183(d) might look to years prior to 1970 because petitioner did not have gross income derived from his dogs which exceeded deductions attributable to such activity. Compare Lee, "Section 183 and Beyond," *supra* at 358, with Dickinson, "Farm and Ranch Losses," B.N.A. Tax Management Portfolio No. 241-2nd, A-18. Petitioner has not made an election under sec. 183(e). See Temporary Reg. sec. 12.9(c).

the dogs were $3,817 in 1973. On cross-examination, moreover, petitioner admitted to having only three potential customers. Thus, we conclude that petitioner did not have a bona fide expectation of making a profit which would also recoup his prior losses.

Instead, we believe the dogs were more in the nature of a hobby. During the years that petitioner engaged in the dog raising and training, his income from other sources was not insubstantial, and it afforded him the means of engaging in the dog activity. He had been interested in outdoor activities from the time he was a child. He began hunting at the age of 20 and he gave the impression that he would have continued to hunt during the years in question had it not been for his concern about the increased number of hunters. We infer that the dogs became a substitute in that field trials are akin to hunting. In this vein, we note that, while Ferchen and/or Walgate cared for the dogs, petitioner participated in the contests and one of the expenses for 1973 was for birds at a cost of $375. Another consideration is that petitioner admittedly acquired his first pointer, Arrak, as a pet and hunting companion. At a time before he contemplated acquiring other pointers or going into the alleged business of raising pointers, he apparently derived pleasure not only from owning Arrak as a pet but also from participating in trial shows because he did so with Arrak.[11] It was at a subsequent time, after talking to other owners and trainers at field trials that he decided, according to his testimony, to raise pointers for profit. He hoped to establish a name for his kennel, yet he did not register the "Ef-Fex" name with the American Kennel Club.

When he talked with the other owners and trainers who purportedly told him that he could make a profit, he based his decision to buy more pointers entirely on what they had told him. He did not conduct any further investigation. Yet, the people whom he relied on were presumably those who had an interest in encouraging other people to buy and train pointers. The record is clear that several owners and trainers did in fact benefit from petitioner's decision. Petitioner was a relative novice and it is laudable that he consulted those who knew more

---

[11] See *Robert E. Currie*, T.C. Memo. 1969-4, 28 T.C.M. 19, where we stated: "But we believe that the history of petitioner's enjoyment from these animals raises a presumption under the circumstances of this case that he was not in the trade or business of raising them. That is, a greater amount of proof is required than would be necessary if he had not enjoyed these animals as pets."

about pointers than himself, but we had the impression as petitioner testified that he had initiated a purportedly profit-making venture after only a cursory investigation of its potential.

In view of the foregoing, we hold that petitioner did not engage in breeding, raising, and training pointers for profit. Accordingly,

*Decisions will be entered for the respondent.*[12]

___

[12] As noted earlier, sec. 183 is applicable to taxable years beginning after Dec. 31, 1969. Because no income was reported with respect to the activity in question for taxable year 1970, sec. 183(b)(2) would not apply.