CARL E. AND DANA RIDDLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Riddle v. Commissioner
Docket Nos. 21994-91, 21995-91.
United States Tax Court
T.C. Memo 1994-133; 1994 Tax Ct. Memo LEXIS 141; 67 T.C.M. (CCH) 2533; March 29, 1994, Filed *141 Decisions will be entered for respondent. Karl H. Goodman, for petitioners. Robert E. Williams, Jr., for respondent. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: These consolidated cases were assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $ 3,881, $ 3,820, and $ 2,893 for the taxable years 1988, 1989, and 1990 respectively. The only issue for decision is whether, during the taxable years in issue, petitioners operated their drag racing activity with a profit objective. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioners resided in Baltimore, Maryland, at the time their petitions were filed with the Court. *142 During the years in issue both petitioners were employed outside the home. Petitioner Carl Riddle (hereinafter sometimes referred to as Mr. Riddle) was a repairman on the General Motors Corp. assembly line. He worked between 8 and 10 hours a day, generally arriving at 6:00 a.m. During the same period, petitioner Dana Riddle (hereinafter sometimes referred to as Mrs. Riddle) was employed by the Giant Food Co. as a stocker. [2] Prior to the years in issue, Mrs. Riddle also worked as a bookkeeper for third parties. Although only Mr. Riddle actually raced in drag races, petitioners each contributed to, and participated in, the activity. Both considered the activity hard work, but both also appreciated racing cars and enjoyed participating in the drag racing activity. Petitioners owned the car (the car), which bore the legend "Riddle's Racing," in which Mr. Riddle raced. Mrs. Riddle was primarily *143 responsible for maintaining records relating to the drag racing activity. Mr. Riddle was primarily responsible for maintaining, repairing, and upgrading the car. [3]
The car was a dragster, specifically designed to compete in bracket races. Although constantly attended to, the car depreciated in value during the period petitioners owned it. In order to learn more about motor construction, petitioner has reviewed books and manuals. He has also consulted with local machine shop owners when purchasing items from their stores. During the years in issue, petitioner was a member of both the International Hotrod Association and the National Hot Rod Association (NHRA). He also held a Competitor's License (the license) from the NHRA. In order to obtain the license, he was obliged to fulfill certain requirements, including passage of a specialized driving test in the car in which *144 he intended to compete. Before each competition, the NHRA would examine petitioners' car to ensure that it met their requirements. During the bracket racing season, from March through November, petitioners participated in bracket racing at Maryland area tracks. The farthest track where they raced was a 2-1/2 hour drive from their home. During the years in issue, petitioners tried to enter two races a week, sometimes only actually competing in one and sometimes competing in three. They participated in bracket races with a handicapped start rather than in so-called "head's up" races in which the first person to cross the finish line wins. Petitioners entered races with the intention and desire to win as much of the prize money as they could. During the years in issue, they did not enter races where the only prize was a trophy. In bracket racing, two cars race on the track at the same time. There are several rounds in each race. Over 100 entrants generally participate in the first elimination round. A racer who succeeds in reaching the fourth round will usually recover the entry fee of $ 30 or $ 35. The final round determines who places first and who places second. First *145 and second prizes of approximately $ 1,000 and $ 500 were offered to competitors finishing in first and second place in the races in which petitioners competed. Petitioners have never won more than a nominal amount at a race. [4] Petitioners do not assert that they have ever earned a profit from their drag racing activities. Petitioners do not participate in divisional or national drag racing competitions. Those races involve greater expenses than local races, both because they have higher entry fees and because they require that competitors be present for 2-3 days rather than a single day. However, the money available from sponsors is also greater in divisional and national races than in local races. Sponsorship is one mechanism through which drag racers can finance their racing activities. Although petitioners did not prepare any formal promotional package, they did attempt *146 to obtain the support of sponsors to defray their costs. In particular, Mrs. Riddle approached sponsors by mail, by telephone, and in person. Petitioners had limited success in attracting sponsors during the years in issue. However, they were sponsored by GER Precision Converter (GER) and by Kendall Oil. In exchange for the publicity provided by featuring their logos on petitioners' car, each sponsor provided petitioners with the sponsor's products. In the case of GER, petitioners also conducted converter and transmission tests in exchange for the company's sponsorship. Petitioner testified that to the best of his knowledge, GER did not sponsor other racers during the years in issue. Petitioners received no money from sponsors. Petitioners' combined wage income for each of the years in issue was approximately $ 55,500. Mr. Riddle testified that if he had run more races during the years in issue, petitioners could have earned between $ 65,000 and $ 75,000 from the racing activity in each year. Petitioners claimed losses relating to their drag racing activity for each of the years in issue. Specifically, for the taxable years 1988, 1989, and 1990, they claimed deductions *147 in the amounts of $ 18,354, $ 17,905, and $ 13,480, respectively. The following chart reflects the gross receipts, [5] expenses, and losses declared by petitioners on Schedule C for the years 1986 through 1992. Year
Gross Receipts
Expenses
(Losses)
1986
$ 6,785
$ 15,981
$ ( 9,196)
1987
--
11,089
(11,089)
1988
150
18,504
(18,354)
1989
375
18,280
(17,905)
1990
1,790
15,270
(13,480)
1991
870
23,163
(22,293)
1992
2,150
19,913
(17,763)
For the years in issue, respondent disallowed the loss deductions pursuant to section 183 on the ground that the drag racing activity was not engaged in for profit. Respondent concedes that petitioners have substantiated their expenses. OPINION As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that *148 the determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In order to sustain their burden in this case, petitioners are obliged to show that they engaged in their drag racing activity with an actual and honest objective of earning a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The existence of the requisite profit objective is a question of fact which must be determined on the basis of the entire record. Benz v. Commissioner, 63 T.C. 375, 382 (1974). In resolving this factual question, greater weight is accorded objective facts than a taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.
The regulations set forth a nonexhaustive list of factors to be considered in deciding whether a profit objective exists. These factors are: (1) The manner in which the taxpayers carry on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that *149 the assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on other similar or dissimilar activities; (6) the taxpayers' history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayers; and (9) any elements indicating personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. No single factor, nor even the existence of a majority of factors favoring or disfavoring the existence of a profit objective, is controlling. Id. Rather, the relevant facts and circumstances of the case in their totality are determinative. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). We begin by considering the manner in which the activity was carried on. Sec. 1.183-2(b)(1), Income Tax Regs. Here we conclude that the manner in which petitioners operated their drag racing activity during the years in issue is not consistent with the claim that they operated it with a profit objective. Id. In this case, petitioners' failure *150 to operate their drag racing activity in a manner consistent with the claim that it was operated with a profit objective is the strongest factor favoring respondent because there is no evidence that petitioners ever even considered how to maximize their earnings, much less earn a profit. Among the primary indicators that petitioners failed to operate the drag racing activity in a manner suggesting a profit objective is the fact that petitioners neither attempted to develop a business plan nor to prepare profit projections. Although petitioners discussed the costs of attending each individual competition and the amount that they would need to win to recoup that cost, they did not consider how much income they would need to recoup their overall investment. Moreover, petitioners themselves were unable to advise the Court when they began viewing their involvement in drag racing activity as a for-profit endeavor. Moreover, petitioners did not maintain the types of books and records associated with a for-profit business. Mrs. Riddle was primarily responsible for maintaining the records related to the activity. Although she has worked as a bookkeeper for third parties, Mrs. Riddle recorded *151 only the expenses associated with the drag racing activity. While she was meticulous in keeping track of the expenditures, Mrs. Riddle failed completely to reflect the receipt of any income in the records. For example, she maintained no record of the races petitioners entered, the amount which they won, or the amount of support provided by sponsors. Mrs. Riddle candidly acknowledged that the records she did keep were primarily for tax purposes. Additionally, although petitioners testified that they were attempting to build a reputation to gain sponsors, they were unable to provide additional evidence of their efforts to obtain sponsorship. Moreover, they did not advertise and did not prepare promotional packages. Thus, while we recognize that petitioners had at least two sponsors during the years in issue, we conclude that petitioners viewed the sponsorship support as a mechanism to defray costs and not as a mechanism for earning a profit. Related to the issue of whether the activity was run in a businesslike manner is the issue of the expertise of the taxpayers or their advisers. Sec. 1.183-2(b)(2), Income Tax Regs. There is no question that petitioners are knowledgeable *152 about drag racing, about race cars, and about motors. However, although petitioners wished to improve their performance at competitions, they did not make any concerted effort towards that end. For example, they did not consult with expert advisers or otherwise engage in significant efforts to enhance their expertise during the years in issue. During the years in issue petitioners both held paid positions outside the home. Thus, the amount of time they could devote to operating or advancing the drag racing activity was necessarily limited. They did not engage any third parties to assist them in the activity. We observe that petitioners' wage income for the years in issue averaged about $ 55,500. Mr. Riddle testified that had petitioners devoted more time to the drag racing activity, they could have earned between $ 65,000 and $ 75,000 a year from the racing activity. Their decision not to devote more time to the racing activity undermines petitioners' claim that the drag racing activity was engaged in with a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs.
Asset appreciation might have been a factor in petitioners' favor had petitioners shown that the race car they *153 owned would appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Instead, petitioner's testimony was to the contrary, that the car would depreciate in value over time. Although it is not entirely clear from the record, it appears that petitioners never earned a profit from their drag racing activity. It is undisputed that they did not earn a profit between 1986 and 1990, which includes the years in issue. This pattern of continuous and uninterrupted losses undermines petitioners' claim of a profit objective. Sec. 1.183-2(b)(6) and (7), Income Tax Regs.
The pattern of losses might be less damaging to petitioners' cause if there were a trend pointing towards profitability. However, this is not the case. Not only is there no trend toward profitability, but there is no evidence in the record to indicate that petitioners have attempted to convert the activity to a profit-producing one. In this case, petitioners' financial status is a relatively neutral factor. Sec. 1.183-2(b)(8), Income Tax Regs. On the one hand, petitioners enjoyed tax benefits over the years from the losses incurred from their drag racing activity. See Sutton v. Commissioner, 84 T.C. 210, 226 (1985), *154 affd. 788 F.2d 695 (11th Cir. 1986). On the other hand, as noted in the regulations, "The fact that the [taxpayers do] not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs. Here petitioners' income was relatively moderate, and it is not clear that they engaged in the drag racing activity as a means to shelter part of their income. The issue, however, is not whether petitioners were attempting to shelter income, but whether they had a profit objective. Petitioners' financial status does not clearly suggest how that issue should be resolved. Finally, although the Court accepts the testimony of petitioners that the drag racing activity often involved hard work under difficult circumstances, we find that the drag racing activity provided petitioners with considerable personal satisfaction. Sec. 1.183-2(b)(8), Income Tax Regs.
Although it is undisputed that petitioners wanted to win the races they entered and to win the prizes in those races, a desire to win prize money is not the equivalent of the actual and honest objective of earning a *155 profit. Accordingly, based on the evidence presented, we hold that petitioners did not engage in the drag racing activity with the actual and honest objective of earning a profit during the years in issue. Accordingly, based on a review of all the facts and circumstances, we sustain respondent's determination. To reflect the foregoing, Decisions will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. References to petitioners are to both Mr. and Mrs. Riddle, while references to petitioner in the singular are to Mr. Riddle.↩
3. Mrs. Riddle did, however, serve as the pit crew when Mr. Riddle raced, suggesting that she too had developed some knowledge of mechanics.↩
4. The record does not reflect the total amount of money won by petitioners because they did not record their income, only their expenses.↩
5. It is unclear how petitioners arrived at the figures for gross receipts as Mrs. Riddle testified that petitioners maintained no records of income relating to the drag racing activity.↩