T.C. Summary Opinion 2001-157


UNITED STATES TAX COURT


KARL MEYER AND VICKIE MEYER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7403-00S.                    Filed September 26, 2001.


Karl Meyer and Vickie Meyer, pro sese.

R. Scott Shieldes, for respondent.


ARMEN, Special Trial Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1] Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 1997, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1997 in the amount of $3,612.

After a concession by respondent,[2] the sole issue for decision is whether petitioners engaged in an Amway activity for profit within the meaning of section 183.

Background[3]

Some of the facts have been stipulated, and they are so found.

Petitioners are husband and wife and have been married since 1992.  They resided in Houston, Texas, at the time that their petition was filed with the Court.

A.  Petitioner Husband

Petitioner husband (Mr. Meyer) is, by profession, a salesman of medical equipment and has been employed by Xomed, Inc. (Xomed) for approximately 15 years.  Xomed specializes in the production of medical equipment for use by health care providers who practice in the ear, nose, and throat area.  As a salesman for Xomed, Mr. Meyer typically contacts doctors and nurses within an

---

[2] At trial, respondent conceded that petitioners are entitled to the Schedule A, Itemized Deductions, deduction for unreimbursed employee business expenses (incurred by petitioner Karl Meyer in the course of his employment as a salesman for Xomed, Inc.) as claimed by petitioners on their return for the year in issue.

[3] At trial, we deferred ruling on respondent's relevancy objection to petitioners' Exhibit 23-P, a collection of business articles.  We now overrule that objection and admit the exhibit into evidence.

assigned geographical territory in Texas for the purpose of demonstrating and selling Xomed's products.

Mr. Meyer is compensated by Xomed on a straight commission basis, and he is precluded by his employer from participating in other for-profit sales activities. His compensation for 1994 through 1999 was $80,114, $83,403, $116,186, $97,329, $140,008, and $149,610, respectively.

B. Petitioner Wife

Petitioner wife (Mrs. Meyer) is a homemaker and mother of three children: Alexandra, born in July 1989; Jeffrey, born in August 1993; and Andrea, born in March 1995.

In 1985, Mrs. Meyer filed an assumed name certificate with the Harris County (Houston, Texas) Clerk's Office, adopting the business name of Vickie Zozaya Enterprises. However, Mrs. Meyer never conducted any type of activity with respect to this enterprise.

In 1994, Mrs. Meyer began designing and making jewelry pins and selling them at craft shows under the assumed name of Trinkets, Etc. Less than a year thereafter, Mrs. Meyer ceased to operate Trinkets, Etc. because its time-consuming nature and lack of profitability did not allow Mrs. Meyer to properly care for her children. Petitioners' income tax return for 1994 included a Schedule C, Profit or Loss from Business, claiming a net loss of $188 (i.e, gross income of $247 less car expenses of $435) from

Trinkets, Etc.

C.  Amway

In August 1994, petitioners began to operate an Amway distributorship under the name of Meyer Enterprises.  Petitioners began the Amway activity after being recruited as "downline" distributors by an "upline" distributor.

Amway is a supplier of household and personal use products that are sold by individuals (distributors) through direct marketing.  An Amway distributor purchases Amway products for resale to both customers and "downline" distributors, as well as for personal use.

At least in theory, Amway distributors generate receipts by selling Amway products directly to customers and by recruiting new distributors.  The new recruits become "downline" distributors of the sponsoring distributor and a part of his or her organization.[4]  In turn, each "downline" distributor is encouraged to sponsor additional new distributors, all of whom become a part of the initial distributor's organization.[5]  Amway does not assign exclusive geographical territories to any distributor, nor does Amway impose a minimum sales quota on any distributor.

---

[4]  The sponsoring distributor is referred to as the "upline" distributor.

[5]  The process of recruiting new distributors is often referred to as "building the legs" of a distributor's network.

Amway maintains a "pyramid" incentive system. Under this system, an "upline" distributor receives a bonus based on the volume of sales generated by his or her "downline" distributors.[6] Thus, the system presumes that the "upline" distributor's potential for profit will increase as his or her network of "downline" distributors becomes wider and deeper.[7]

Because the "upline" distributor's bonus is based on the volume of sales generated by "downline" distributors, such bonus is not directly affected by a "downline" distributor's profitability or lack of profitability.

The Amway "pyramid" incentive system is promoted by Amway in the form of the "9-4-2 plan".[8] Under the "9-4-2 plan", each Amway distributor is encouraged to personally recruit 9 "downline" distributors, each of whom in turn is encouraged to recruit at least 4 "downline" distributors, each of whom in turn is encouraged to recruit at least 2 "downline" distributors (for

---

[6] The "upline" distributor's bonus is also based on the volume of sales generated by the "upline" distributor himself or herself. However, the volume of such sales is generally minimal, and the portion of the bonus attributable to such sales is negligible.

[7] The "width" of a network refers to the number of "downline" distributors that are personally sponsored by the distributor in question, and "length" refers to the number of "downline" distributors that make up each "leg" of the network.

[8] More typically, the Amway system is promoted in the form of the "6-4-2 plan". See Nissley v. Commissioner, T.C. Memo. 2000-178. The two plans are identical, except for the number of first-tier "downline" distributors.

a total of 117 "downline" distributors in the initial distributor's organization). The "9-4-2 plan" is promoted as the theoretical break-even point for a distributorship, assuming that (1) the distributor and each "downline" distributor within the distributor's organization purchases $200 of Amway products per month and that (2) the distributor does not have expenses exceeding $2,000 per month. At least in theory, the potential for profit is enhanced as each of the 117 "downline" distributors in the distributor's network successfully implements the "9-4-2 plan".

The Amway "9-4-2 plan" does not provide meaningful guidance to distributors regarding how expenses incurred in pursuing an Amway activity may be reduced.

The structure of the Amway "pyramid" incentive system effectively serves to discourage distributors from spending their time personally trying to sell Amway products. In contrast, the system effectively serves to encourage distributors to spend their time trying to recruit an ever-increasing number of "downline" distributors.

Amway distributors are entitled to purchase Amway products for their personal use at distributor's cost without the customary percentage markup.[9]

---

[9] Although the record is not crystal clear, it would appear that 30 percent was the customary markup.

D.  Nature of Petitioners' Amway Activity

At the time that they were recruited as Amway distributors in August 1994, petitioners had no prior experience with Amway or an Amway type activity.

Other than accepting the Amway "9-4-2 plan", petitioners never developed a business plan for their Amway activity, nor did they ever prepare profit projections or undertake any type of market analysis.  Although petitioners maintained a monthly report of expenses incurred in pursing their activity, they never prepared a break-even analysis nor a formal budget.

Despite their lack of experience with either Amway or an Amway type activity, petitioners never sought meaningful counsel from disinterested third parties.  Rather, petitioners relied principally on advice from "upline" distributors and other interested Amway individuals.

Petitioners spent little time personally trying to sell Amway products.  Indeed, from February through September 1997, no retail sales were made.  Rather, petitioners concentrated on trying to recruit, and retain, "downline" distributors.  Gross income received by petitioners consisted principally of bonuses earned from the sale, or personal consumption, of Amway products by "downline" distributors.

E.  Petitioners' Separation and Its Effect on the Amway
Activity

Upon becoming Amway distributors in August 1994, petitioners assigned themselves different roles.  Because Mrs. Meyer had virtually no time to spend operating a business outside the home due to parental obligations, and because of Mr. Meyer's experience as a salesman, the task of operating the Amway activity was initially assumed by Mr. Meyer.  Indeed, on their income tax returns, petitioners identified Mr. Meyer as "proprietor" of the distributorship.

In contrast, Mrs. Meyer assumed responsibility for taking care of the paperwork for the Amway activity.  This responsibility included inputting data related to income and expenses onto Quicken, the personal finance software program.  Mrs. Meyer would then periodically compile a list of expenses for the preceding month.  In addition to such paperwork tasks, Mrs. Meyer also "associated" with the wives of prospective and actual "downline" distributors.

In or about 1996 petitioners experienced marital problems that lead to their separation in October 1996 and the commencement of an action for divorce that December.  Mr. Meyer disassociated himself from the Amway distributorship, and Mrs. Meyer assumed her husband's role.  In particular, petitioners filed a Business Status Change Form with Amway in October 1996, which form served to remove Mr. Meyer's name from the

distributorship and to place the distributorship in Mrs. Meyer's sole name.

In addition to the $1,500 in negotiated child support to which she was entitled, Mrs. Meyer hoped to receive from the Amway distributorship "enough money so that I could continue staying home with my kids." In this regard, Mrs. Meyer estimated that monthly Amway income of $1,000 would be sufficient to sustain herself and her children. In order to produce that income, Mrs. Meyer estimated that 25 "downline" distributors were required, each of whom needed to purchase $200 of Amway products for their personal use each month. In so estimating, Mrs. Meyer relied on a profitability worksheet that was included with the "9-4-2" plan given to her by her "upline" distributor.

Mrs. Meyer devoted "very little" time to making retail sales. Rather, she "was out for distributors". In this regard, Mrs. Meyer attempted to recruit "downline" distributors by "talking to anybody and everybody I knew. Anybody that shops." In order to talk to anyone who shops, Mrs. Meyer would frequent public areas, such as churches, malls, and parks, in order to make contacts so that she could "distribute hope back into people's lives.".

F.  Petitioners' Reconciliation and the Termination of the Amway Activity

By November 1997, petitioners had reconciled, and the divorce action was nonsuited.  Subsequently, at some point in 1998, petitioners decided that they would no longer actively pursue the Amway activity.  Since that time, however, Mrs. Meyer has continued to renew her status as an Amway distributor in order to retain the right to purchase Amway products, such as vitamins and cleaning products, for petitioners' personal use at discount prices.

G.  Petitioners' Schedule C Losses

For all relevant years, specifically including the taxable years 1994 through 1998, petitioners filed joint Federal income tax returns.  Petitioners attached to each of those returns a Schedule C, Income or Loss From Business, identifying "Karl L. Meyer" as "proprietor" of "Meyer Enterprises" and describing the principal business or service of such enterprise as "Distribution".

Petitioners have never reported a profit from the Amway activity.  Rather, petitioners have consistently claimed losses from this activity and have used such losses to offset Mr. Meyer's compensation as a salesman.

The following schedule reflects the losses claimed by petitioners from the Amway activity on Schedules C of their tax returns for 1994 through 1998:

| Year | Net Loss |
|------|----------|
| 1994 | $4,216 |
| 1995 | 12,805 |
| 1996 | 16,295 |
| 1997 | 11,251 |
| 1998 | 4,997 |
|      | 49,564 |

Since 1998 petitioners have not claimed any losses from the Amway activity.

Petitioners determined the amounts of their losses from the Amway activity on Schedules C of their tax returns for 1994 through 1998 as follows:

|  | 1994 | 1995 | 1996 | 1997 | 1998 |
|--|------|------|------|------|------|
| Gross income[1] | $27 | $1,037 | $504 | $407 | $2,810 |
| Less: expenses | 4,243 | 13,842 | 16,799 | 11,658 | 7,807 |
| Net loss | 4,216 | 12,805 | 16,295 | 11,251 | 4,997 |

[1] Gross income was essentially the bonuses earned from the sale (or personal consumption) of Amway products by "downline" distributors.  Petitioners themselves sold relatively few Amway products.

Petitioners deducted expenses for the Amway activity on Schedule C of their tax returns for 1994 through 1998 as follows:

|                        | 1994    | 1995    | 1996    | 1997    | 1998    |
|------------------------|---------|---------|---------|---------|---------|
| Advertising            | ---     | $231    | $392    | $173    | $292    |
| Car expenses           | $1,912  | 5,472   | 5,560   | 6,888   | 2,621   |
| Commissions/fees       | 120     | 382     | 33      | ---     | ---     |
| Legal/prof. services   | ---     | 560     | ---     | ---     | ---     |
| Office expense         | ---     | ---     | 577     | 78      | 133     |
| Supplies               | 1,162   | 1,582   | ---     | 1,352   | 1,684   |
| Travel                 | 605     | 200     | 2,574   | 616     | ---     |
| Meals/entertainment[1] | 405     | 169     | 194     | 52      | 186     |
| Utilities              | ---     | 761     | 836     | 608     | 348     |
| Other expenses         |         |         |         |         |         |
|   Pubs       | 15      | 3,289   | 3,226   | ---     | ---     |
|   Seminars/workshops | --- | 1,196 | 2,587 | 1,364  | 1,104   |
|   Rally tickets | 24   | ---     | ---     | ---     | ---     |
|   Cell phone | ---     | ---     | 592     | 458     | 1,086   |
|   Dues       | ---     | ---     | ---     | 56      | 28      |
|   Postage    | ---     | ---     | 128     | 13      | 11      |
|   Voice way  | ---     | ---     | ---     | ---     | 314     |
| Total expenses         | 4,243   | 13,842  | 16,699  | 11,658  | 7,807   |

[1]Net after 50-percent reduction per sec. 274(n).

For the year in issue, petitioners deducted car expenses for a Suburban SUV based on "business" use of 74.13 percent. Petitioners determined this percentage based on the following figures:

|                        |        |
|------------------------|--------|
| "Business" miles driven | 21,867 |
| Personal miles driven  | 7,633  |
| Total miles driven     | 29,500 |

Discussion

Under section 183(a), if an activity is not engaged in for profit, then no deduction attributable to the activity shall be allowed except to the extent provided by section 183(b). In pertinent part, section 183(b) allows deductions to the extent of gross income derived from an activity that is not engaged in for profit.

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 or under section 212(1) or (2) if the taxpayer is engaged in the activity with the "actual and honest objective of making a profit." Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

The existence of the requisite profit objective is a question of fact that must be decided on the basis of the entire record. Benz v. Commissioner, 63 T.C. 375, 382 (1974). In resolving this factual question, greater weight is accorded objective facts than a taxpayer's statement of intent. Westbrook v. Commissioner, 68 F.3d 868, 875-876 (5th Cir. 1995), affg. T.C. Memo. 1993-634; sec. 1.183-2(a), Income Tax Regs. For purposes of deciding whether the taxpayer has the requisite profit objective, profit means economic profit, independent of tax savings. Surloff v. Commissioner, 81 T.C. 210, 233 (1983).

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in

carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.

No single factor, nor even the existence of a majority of factors favoring or disfavoring the existence of a profit objective, is controlling. Id.; Ogden v. Commissioner, T.C. Memo. 1999-397, affd. per curiam 244 F.3d 970 (5th Cir. 2001). Rather, the relevant facts and circumstances of the case are determinative. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Based on all of the facts and circumstances in the present case, we hold that petitioners did not engage in the Amway activity for profit within the meaning of section 183.

We shall not analyze in depth all nine of the factors enumerated in the regulation but rather focus on some of the more important ones that inform our decision.

First, the history of consistent and substantial losses incurred by petitioners in the Amway activity is indicative of a lack of profit objective. See Golanty v. Commissioner, supra at

427; sec. 1.183-2(b)(6), Income Tax Regs. A series of losses during the initial stage of an activity is not necessarily an indication that a taxpayer is not engaged in an activity for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, if such losses continue beyond the period in which it is customary for an activity to become profitable, then the losses, if they are unexplainable, may be indicative of a lack of a profit objective. Id.

Since the inception of the Amway activity in 1994, petitioners never earned a profit therefrom but rather incurred losses for 5 consecutive years. Indeed, petitioners' aggregate losses for the 5-year period from 1994 through 1998 amounted to $49,564, thus averaging approximately $10,000 per year.

Further, no significant trend is discernible in the history of petitioners' losses. For 1994, 1995, 1996, and 1997, petitioners incurred losses of $4,216, $12,805, and $16,295, and $11,251 respectively. It bears mention that petitioners became Amway distributors in the latter part of 1994; thus, the loss for that year is based solely on 4 months of operation. Further, although it is true that petitioners' loss decreased in 1998 to $4,997, it is also true that 1998 was the last year in which petitioners actively pursued the Amway activity.

Second, we are not convinced that petitioners conducted the Amway activity in a businesslike manner. Sec. 1.183-2(b)(1),

Income Tax Regs. Although petitioners maintained computer-generated records for the Amway activity (and may also have utilized a separate bank account), such records appear to have been maintained principally to satisfy substantiation requirements imposed by the Internal Revenue Code and thus to "guarantee" the deductibility of expenses. In contrast, such records do not appear to have been used as analytic or diagnostic tools in an effort to achieve profitability of the Amway activity. As we have previously stated:

> the keeping of books and records may represent nothing more than a conscious attention to detail. In this case, there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation. The petitioner reviewed her records, but she has failed to show that she used them to improve the operation of the enterprise. [Golanty v. Commissioner, supra at 430.]

Moreover, petitioners did not maintain certain types of records, nor did petitioners employ certain elementary business practices that one would expect of individuals pursuing an activity with a profit objective. See Nissley v. Commissioner, T. C. Memo. 2000-178; Ogden v. Commissioner, supra; Theisen v. Commissioner, T.C. Memo. 1997-539; Hart v. Commissioner, T.C. Memo. 1995-55. Thus, although a monthly report of expenses was maintained, neither profit projections, a break-even analysis, nor a formal budget was ever prepared. Further, no market analysis was ever undertaken, nor was any business plan (other

than the Amway "9-4-2 plan") ever developed.

Furthermore, for the year in issue, no in-depth analysis was ever performed in order to determine how many "downline" distributors were needed to attain a break-even point. Although Mrs. Meyer estimated that 25 distributors were required to attain a "bare bones" standard of living, such estimate was not based on a business plan or any independent analysis. Rather, Mrs. Meyer was content to rely on the profitability worksheet given to her by an "upline" distributor.

A third factor militating against petitioners' claim of profit objective is the fact that petitioners had no experience with Amway or an Amway type of activity at the time that they were recruited by an Amway distributor. See sec. 1.183-2(b)(2), Income Tax Regs. Since that time, petitioners have principally relied only on advice from "upline" distributors and other interested Amway individuals.

Yet, under the Amway system, the "upline" distributor's bonus is not directly affected by the "downline" distributor's profitability or lack of profitability; rather, what is important to the "upline" distributor is the "downline" distributor's volume of sales. Nevertheless, petitioners have steadfastly refused to seek meaningful counsel from disinterested third parties regarding means by which the Amway activity might be made

profitable.[10]  See <u>Poast v. Commissioner</u>, T.C. Memo. 1994-399 ("for the most part, petitioners' advisers were not experts as much as they were upliners with a financial stake in petitioners' retail and downline sales"); <u>Ogden v. Commissioner</u>, T.C. Memo. 1999-397 ("Amway distributors may be biased when discussing Amway because they have a natural desire to advance the organization and/or obtain income from a downliner.").

Petitioners' refusal to seek meaningful counsel from disinterested third parties is all the more telling given the fact that the advice received from interested Amway individuals did nothing to reverse petitioners' history of uninterrupted and substantial losses.  Furthermore, the record suggests that the "advice" petitioners received consisted of little more than platitudes, generalities, and encouragement to "give it all you've got".

A fourth factor militating against petitioners' claim is the amount of time that petitioners devoted to the Amway activity. See sec. 1.183-2(b)(3), Income Tax Regs.  In this vein, Mrs. Meyer repeatedly testified that the key to a successful Amway "business" was not selling products, but rather establishing an extensive network of "downline" distributors in order to "change

---

[10]  We do not regard general encouragement given by Mrs. Meyer's divorce lawyer to "stick with it" to constitute meaningful business counsel.  In any event, Mrs. Meyer admitted that this individual never gave her advice concerning how the Amway activity might be made profitable.

the way people shop". However, for the year in issue, Mrs. Meyer could not approximate how much time she spent on the Amway activity, other than to state that "very little" time was devoted to retail sales. Indeed, the record reflects that no sales were made for a consecutive 8-month period. Mrs. Meyer's time and effort consisted of nothing more than engaging in the daily activities of a homemaker and mother. Her testimony at trial underscores this conclusion:

> Q: Do you know how much time you spent a day or a week during 1997 showing the plan?
>
>      \*   \*   \*   \*   \*   \*   \*
>
> A: Not much in the beginning because again, like I said, I was out meeting people, getting to know someone to – in order to show them the plan, * * * I went to a lot of Bible studies. * * * I was attending Second Baptist Church, and they had a lot of singles activities, and so I would go to them.
>
> I went to shopping in the mall. That's places I could take the kids. I would go to parks. I would go to – basically I talked to people, and anywhere and any way that I could get a name, something that I could find in common with them to get back with them again later to try and develop and build a friendship.

Fifth, section 1.183-2(b)(8), Income Tax Regs., provides that "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Golanty v. Commissioner, supra at 428-429; see Ransom v. Commissioner, T.C. Memo. 1990-381.

In the present case, Mr. Meyer is a successful salesman. His aggregate commission income for the 3-year period from 1994 to 1996 amounted to $279,703, or approximately $93,000 per year. For 1997, the year in issue, Mr. Meyer's commission income exceeded $97,000. On joint returns for each of these 4 years, petitioners claimed losses from their Amway activity, which losses served to reduce Mr. Meyer's compensation, thereby decreasing petitioners' taxable income and achieving substantial tax savings.[11]

This Court has observed that "there are significant elements of personal pleasure attached to the activities of an Amway distributorship" and that an "Amway distributorship presents taxpayers with opportunities to generate business deductions for essentially personal expenditures." Brennan v. Commissioner, T.C. Memo. 1997-60; see also sec. 1.183-2(b)(9), Income Tax Regs.; cf. sec. 1.183-2(b)(8), Income Tax Regs., regarding the reference to "personal or recreational elements" quoted above.

Moreover, petitioners received a personal benefit from their Amway activity through their ability to purchase Amway products for their own personal use at distributor's cost without the customary percentage markup. At trial, petitioners candidly

---

[11] Those savings also helped to finance car expenses. Thus, for example, in 1997 petitioners deducted automobile expenses on their Suburban SUV based on "business" use in excess of 74 percent.

admitted that one of the major benefits of being Amway distributors was the savings that they could realize on the purchase of products for personal use. The fact that Mrs. Meyer has continued to renew her Amway membership in order to purchase merchandise at discount prices illustrates the personal dimension of the Amway activity.

On this record, we find that petitioners did not have the requisite objective in 1997 of making a profit in the Amway activity. Accordingly, we hold that petitioners are not entitled to deduct the loss from the Amway activity for that year.

Reviewed and adopted as the report of the Small Tax Case Division.

In order to give effect to our disposition of the disputed issue, as well as respondent's concession, see supra note 2,

Decision will be entered

under Rule 155.
